A. R. BARNES & Co. *et al.* Appellees, *vs.* THE CHICAGO TYPOGRAPHICAL UNION No. 16 *et al.* Appellants.

*Opinion filed February 20, 1908.*

1. LABOR UNIONS—*improper strike methods cannot be justified upon ground of business competition.* A combination by a labor union and its officers and members to injure the business of an employer of labor in order to compel him to surrender to the union his absolute right to manage his own business and employ such labor as he chooses cannot be justified as legitimate competition in business, and any interference with his right, whether by threats, intimidation or persuasion, accompanied by actual malice, is a legal wrong, the accomplishment of which may be enjoined.

2. SAME—*picketing is unlawful although no violence is used.* An employer of labor and the laborers in his employ have a right to pursue their business free from molestation, interference or an-

noyance from third parties, and the establishing of a picket system is, of itself, an act of intimidation and an unwarrantable interference with their rights, whether violence is resorted to or not.

3. SAME—*mere persuasion, if intended to produce an illegal result, is unlawful.* A combination by a labor union and its members for the purpose of intentionally injuring the business of an employer of labor in order to compel him to accede to demands of the union which he has a legal right to refuse is unlawful, and it is as unlawful to produce such illegal result by mere persuasion as it is to produce it by resort to acts of physical violence.

SCOTT and FARMER, JJ., dissenting.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JESSE HOLDOM, Judge, presiding.

WILLIAM H. BARNUM, for appellants.

TENNEY, COFFEEN, HARDING & WILKERSON, (HORACE KENT TENNEY, and JAMES H. WILKERSON, of counsel,) for appellees.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The superior court of Cook county overruled the demurrer of appellants to the bill of complaint filed against them by the appellees in said court seeking an injunction restraining appellants from interfering with the business of appellees or with their employees, and picketing appellees' premises. The defendants elected to stand by their demurrer and the court entered a decree in accordance with the prayer of the bill, perpetually enjoining defendants "from in any manner interfering with, hindering, obstructing or stopping the business of said complainants, or any of them, or of their agents, servants or employees, in the operation of the business of said complainants, respectively; from picketing or maintaining at or near the premises of said complainants, or any of them, any picket or pickets; from

assaulting or intimidating, by threats or otherwise, the employees of any of said complainants or any persons ·who may become or seek to become employees of said complainants, or either of them; from congregating about or near the places of business of any of said complainants or about or near any place where their employees are lodged or boarded, for the purpose of compelling, inducing or soliciting the employees of any of said complainants to leave their service or to refuse to work for them or any of them, or for the purpose of preventing, or attempting to prevent, any person from freely entering into the service of any of said complainants; from interfering with or attempting to hinder complainants, or any of them, in carrying on their business in the usual and ordinary way; from following the employees of any of said complainants to their homes or other places, or calling upon them, for the purpose of inducing them to leave the employ of said complainants or of molesting or intimidating them or their families; from attempting, by bribery, payment or promise of money, offers of transportation or other rewards, to induce the employees of any of said complainants to leave their service; from organizing or maintaining any boycott against said complainants or any of them; from attempting to induce customers or other persons to abstain from working for or accepting work from said complainants or any of them; from attempting to prevent, by threats or injury or by threats of calling strike, any person from accepting work from or doing work for said complainants or any of them; from attempting to create or enforce any boycott against any of the employees of the complainants, or any of them, and from attempting to induce people in their neighborhood or elsewhere not to deal with them; from sending any circular or other communications to customers or other persons who might deal or transact business with said complainants, or either of them, for the purpose of dissuading such persons from so doing, and from doing any other act

or thing in furtherance of the conspiracy set forth in said bill." The defendants appealed to the Appellate Court for the First District, and the branch of that court affirmed the decree. From the judgment of the Appellate Court this further appeal was prosecuted.

The demurrer admitted the existence of the facts stated in the bill, and the question to be determined is whether such facts authorized the decree. Briefly stated, the facts so alleged and admitted are as follows:

At the time of filing the bill the complainants were, and for several years had been, engaged in the printing business and each had a valuable plant and an extensive business, in the conduct of which they had made contracts for printing for future delivery which would afford a substantial profit. They were and had been members of a voluntary association known as the Chicago Typothetæ, which was organized for the purpose of advancing and improving the printing and binding business and for the purpose of employing skilled mechanics whose services might be required by the members of the association. The defendants were Typographical Union No. 16 and its officers, a labor union existing in the city of Chicago whose members are typesetters and compositors, one of the rules of which was that its members should not work with those who did not belong to that union, and said members were bound, at the command of the union and its officers, to strike and leave the employment of anyone who insisted upon employing non-union men. The plant or shop from which all employees not belonging to this union were excluded was called a closed shop, while one in which the employer exercised his right of employing whom he pleased was called an open shop. In July, 1905, the Typographical Union announced that after January 1, 1906, eight hours should constitute a day's work; that no workman should be allowed to work more than that time and that no employer should be allowed to employ workmen who worked more than eight

hours. Some of the complainants employed compositors who were not members of the union, and the union directed its members who were working for said complainants to strike because of that fact. The officials of the union called upon members of complainants' association and demanded that they agree with the union that on and after January 1, 1906, they would submit to the demand for an eight-hour day and a closed shop. The complainants so applied to refused to accede to the demand or make the agreement, and the officials of the union called a strike in said shops. Upon calling the strike the defendants inaugurated and afterward maintained a system of picketing the places of business of said complainants with pickets, who surrounded the respective places of business and maintained a constant watch upon the employees going to and from their work, and in many cases intimidated them, and endeavored by threats, and in some cases by assaults and open violence, to compel said employees to leave the employment of complainants. In other cases the pickets and members of the union endeavored to induce employees to leave by bribes and offers of money and by offering to procure for them work in other places or offering them transportation to leave the city, and the money necessary for such purposes was furnished by the union. The pickets were maintained by and were under the control and direction of the union and its officers and committees appointed by it. This picketing and interference with employees had continued for several weeks before the bill was filed, and forty-seven affidavits of employees were annexed to the bill, detailing particular acts of the members of the union and the pickets, which affidavits the bill stated were made a part thereof. By these means the defendants seriously interfered with the business of each of the complainants and took away many of their employees and prevented them from obtaining other employees who were willing to work, whereby the complainants were prevented from carrying out their contracts and completing unfinished work.

The defendants were all acting together and in concert, in pursuance of a common plan to injure the complainants and interfere with their business for the purpose of compelling them to agree to the terms imposed by the union and to enter into the said contract. The union was alleged to be a voluntary organization and its members financially irresponsible, so that no adequate judgment for damages against them, or any of them, could be collected. The agreement which the union had presented to the different printing houses and which it was endeavoring to coerce the complainants into executing, provided that no one but members of Chicago Typographical Union No. 16 should be employed; that the employer should respect and observe the conditions imposed by the constitution, by-laws and scale of prices of the union of current date; that beginning January 1, 1906, an eight-hour day should go into effect; that no work should be done for struck shops having difficulty with Typographical Union No. 16, and that the said union agreed to furnish competent union workmen on demand. In the shops where union men were employed, which were called "chapels," the union had a man who was known as the chapel foreman or chairman of the chapel, and the union had issued circulars directed to these chapel foremen requesting them to report immediately any work coming to their offices from any of the nineteen firms named in the notice, which were mostly firms of the complainants, and stating that the executive committee had ordered that all work stop on work for strike-bound houses. The defendants were attempting to enforce a boycott against the complainants by preventing them from having work done by other printing houses or by shops to whom they might apply for work, and thus preventing them from carrying on their business except upon the condition that they should make the agreement demanded by the union. The union published weekly what was called a directory of union printing offices of Chicago, containing the names of offices where

the demands of the union were submitted to and a list of offices on strike, in which latter list were published the names of complainants. The purpose of this directory was to induce people not to deal with the complainants and to compel employees to leave their service. The affidavits stated in detail acts both of persuasion and threatened violence toward employees of the complainants which sustained the charges of the bill in that respect.

The argument that the court erred in overruling the demurrer is upon the two grounds that the bill did not state definite facts but only conclusions and generalities and that all the facts alleged did not authorize any relief or injunction. It is also contended that if the decree is not reversed as a whole, it should be modified so as not to enjoin the defendants from doing certain acts which they claim to be within their lawful and constitutional rights.

It was not necessary that the bill should contain the evidence which would support its general statements, or the circumstances, in detail, which would prove the ultimate facts alleged. It distinctly and clearly averred the essential facts forming the basis of the prayer for relief, so as to be readily understood and to apprise the defendants of what they were required to meet. It alleged that the defendants were acting in combination and by agreement in an endeavor to coerce the complainants as to whom they should employ and what policy they should adopt in the conduct of their business; that defendants had proposed the contract by which the complainants were to comply with the demands of the union with reference to the hours of labor, the scale of wages, and should join in boycotts by refusing to do any work for shops having difficulty with the union; that complainants refused to accede to such demands and insisted upon the right to conduct their business in their own way, and that the defendants, for the purpose of coercing the complainants into submitting to the demands of the union, established a picket system around complainants'

shops, enticed away their employees and resorted to threats, intimidation and assaults to accomplish their ends. The bill charged the combination, the intent and the acts of the defendants, and averred that they proposed to continue the same conduct in furtherance of their scheme. The bill was not defective on the ground that its allegations were not sufficiently specific.

It is not claimed that an injunction was not the proper remedy if the acts of the defendants were without lawful right, but it is argued that there was nothing unlawful. about what was done, because it was done in the course of labor competition for the promotion of welfare of union laborers. The controversies between labor unions and employers have occasionally developed some curious and unusual notions of what constitutes competition, but they have never been generally adopted and have not been approved by the courts. It is true that competition in business justifies action for the benefit of one of the competing parties which results in injury to the other, and a reason frequently given is that the general public benefits outweigh occasional individual losses. One who is seeking employment for himself may offer to work on any terms that he may choose, and the exercise of his legal right may result in the discharge of another laborer. But that rule does not apply to this case. It is not very clear what is meant by competition for the purpose of promoting the welfare of the union and its members, but it is clear that the union and its members were not in competition with the complainants in respect to labor or anything else. The members of the union had left the service of the complainants, and their only purpose was to prevent the complainants from carrying on their business. They were endeavoring to compel the complainants to submit to their dictation by depriving the complainants of their legal right to employ such laborers as they might choose. If there is a combination to injure a person because he refuses to comply with some demand where he has a legal

right to refuse, there is no way of classifying acts in further-
ance of such purpose as competition. The acts alleged in
the bill were directed primarily against the complainants for
the purpose of doing them harm, and that sort of action is
not lawful competition. That question was discussed in the
case of *Doremus* v. *Hennessy,* 176 Ill. 608. In that case it
was recognized that lawful competition which may injure
the business of a person, even though successfully directed
to driving him out of business, is not actionable. In that
case the parties were actually in competition with each other
in the same line of business, and the claim of appellants was
that their acts were in the line of legitimate trade competi-
tion, for which they could not be held liable. It was said
that the appellants had no right, separately or in the aggre-
gate with others, to insist that the appellee should join the
Chicago Laundrymen's Association or to insist that she
make her scale of prices the same as that fixed by the as-
sociation, and to make her refusal to do this a pretext for
destroying and breaking up her business. The court said:
"A combination by them (appellants) to induce others not
to deal with appellee or enter into contracts with her or do
any further work for her was an actionable wrong. Every
man has a right, under the law, as between himself and
others, to full freedom in disposing of his own labor or
capital according to his own will, and anyone who invades
that right without lawful cause or justification commits a
legal wrong." Again, in the case of *London Guarantee and
Accident Co.* v. *Horn,* 206 Ill. 493, the court rejected fanci-
ful and far-fetched definitions of the word "competition"
which would include all conflicts of temporal interests, and
gave to the word its ordinary meaning and signification.
In that case there was a conflict of interest between Horn
and the guarantee company equal to that which existed here
between complainants and defendants, and there was a like
attempt of the guarantee company to derive a benefit by
procuring Horn's discharge. This is not the case of one

laborer seeking to obtain the place of another by offering better services or better terms, which would be competition, nor the case of an employer hiring one laborer away from another because he desires the services of such laborer, but there were offers to pay money and transportation and to maintain laborers in idleness, for which defendants would receive nothing and injury would be inflicted on the complainants. Under the meaning given to the word "competition" in the case last referred to, the complainants and defendants were not in competition in any sense and there could be no justification of defendants' acts on that ground. The whole scheme as set out in the bill was to injure the complainants for the purpose of compelling them to yield to the union their absolute legal right to manage their own business in their own way. In the case of *Mathews* v. *People*, 202 Ill. 389, the right of an employer whose workmen have gone upon a strike to contract with other laborers to fill their places was declared to be an absolute legal right, and the court denied to the legislature the power to prohibit superintendents of free employment agencies from furnishing workmen or lists of workmen to employers whose men were on a strike or locked out, as being repugnant to the constitution. It follows that any interference with that right, whether by threats or intimidation, or by persuasion, accompanied by actual malice, is a legal wrong.

In *London Guarantee and Accident Co.* v. *Horn, supra,* the court quoted from *Bowen* v. *Hall,* 6 Q. B. D. 333, as follows: "If the persuasion be used for the indirect purpose of injuring the plaintiff or of benefiting the defendant at the expense of the plaintiff it is a malicious act, which is in law and in fact a wrong act, and therefore a wrongful act, and therefore an actionable act if injury ensues from it." The court also there re-affirmed the doctrines of *Doremus* v. *Hennessy* by quoting therefrom, as follows: "No persons, individually or by combination, have the right to directly or indirectly interfere or disturb another in his law-

232—28

ful business or occupation, or to threaten to do so, for the sake of compelling him to do some act which, in his judgment, his own interest does not require. Losses willfully caused by another, from motives of malice, to one who seeks to exercise and enjoy the fruits and advantages of his own enterprise, industry, skill and credit, will sustain an action. It is clear that it is unlawful and actionable for one man, from unlawful motives, to interfere with another's trade by fraud or misrepresentation, or by molesting his customers or those who would be customers, or by preventing others from working for him or causing them to leave his employ by fraud or misrepresentation or physical or moral intimidation or persuasion, with an intent to inflict an injury which causes loss."

In the case of *O'Brien* v. *People*, 216 Ill. 354, the court again quoted at length from *Doremus* v. *Hennessy*, and also said: "The law is well settled that every person shall be protected in the right to enter into contracts or in refusing to do so, as he shall deem best for the advancement of his own interests, without interference by others. No person or combination of persons can legally, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business, and any attempt to compel an individual, firm or corporation to execute an agreement to conduct his or its business through certain agencies or by a particular class of employees is not only unlawful and actionable, but is an interference with the exercise of the highest civil right."

In *Purington* v. *Hinchliff*, 219 Ill. 159, the court said: "No person or combination of persons can legally, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business, and any loss willfully caused by such interference will give the party injured a right of action for all damages sustained. All parties to a conspiracy to ruin the business of another because of his refusal to do some act against his will or judgment are liable

for all overt acts illegally done pursuant to such conspiracy and for the subsequent loss, whether they were active participants or not." In *Franklin Union* v. *People*, 220 Ill. 355, the same doctrines were reiterated.

The facts stated in the bill authorized an injunction to prevent carrying out the scheme of the defendants.

It is next contended that if any injunction was authorized, the injunction granted was too broad in enjoining appellants from peaceful picketing of complainants' premises and from congregating about or near their places of business for the purpose of inducing or soliciting employees to leave the employment. It is contended that a peaceful picket line around a shop is entirely lawful. But this court has held otherwise in· *Franklin Union* v. *People, supra,* where endorsement was given to the doctrine of *Beck* v. *Railway Teamsters' Protective Union,* 118 Mich. 497, by quoting therefrom, as follows: "To picket complainants' premises in order to intercept their teamsters or persons going there to trade is unlawful. It, itself, is an act of intimidation and an unwarrantable interference with the right of free trade. The highways and public streets must be free to all for the purposes of trade, commerce and labor. The law protects the buyer, the seller, the merchant, the manufacturer and the laborer in the right to walk the streets unmolested. It is no respecter of persons, and it makes no difference, in effect, whether the picketing is done ten or ten hundred feet away." The court also gave its approval to the decision in *Vegelahn* v. *Guntner,* 167 Mass. 92. In that case a patrol of two men in front of the plaintiff's factory, maintained as one of the means of carrying out the defendants' plan, was held to be an unlawful interference with the rights of the employer and the employed. The patroling or picketing of the premises was considered to have elements of intimidation, and the court decided that the motive of obtaining better wages for themselves on the part of the defendants did not justify maintaining a patrol in

front of the complainant's premises as a means of carrying out their conspiracy. The very fact of establishing a picket line is evidence of an intention to annoy, embarrass and intimidate, whether physical violence is resorted to or not. There have been a few cases where it was held that picketing, by a labor union, of a place of business is not necessarily unlawful if the pickets are peaceful and well behaved, but if the watching and besetting of the workmen is carried to such a length as to constitute an annoyance to them or their employer it becomes unlawful. But manifestly that is not a safe rule and furnishes no fixed or certain standard of what is lawful or unlawful. Any picket line must result in annoyance both to the employer and the workmen, no matter what is said or done, and to say that the court is to determine by the degree of annoyance whether it shall be stopped or not would furnish no guide, but leave the question to the individual notions or bias of the particular judge. To picket the complainants' premises was in itself an act of intimidation and an unwarrantable interference with their rights. Pickets were, in fact, guilty of actual intimidation and threats, but if they had not been, the complainants were entitled to be protected from the annoyance.

Another supposed right of the defendants asserted by counsel is the exercise of the power of persuasion, and it must be conceded that argument and persuasion are lawful if not directed to the accomplishment of an illegal and unlawful purpose. The object of the defendants as set forth in the bill was illegal, and if there is a malevolent intent to produce an illegal result, and it is produced, it makes no difference whether it is accomplished by mere persuasion or by physical violence. (*Curran* v. *Galen,* 152 N. Y. 33.) An act which is naturally innocent, when done with actual malice for the purpose of injuring another, and followed by such injury, is not excused because the act might be innocent under other conditions. It would be no excuse, in law, for a defendant to say: "It is true, I have interfered

with an absolute legal right of the plaintiff to his injury and with a malicious intent to inflict such injury; but my act was not a legal wrong, because I did not commit any breach of the peace or any act of violence, or threaten to do so." The law allows laborers to combine for the purpose of obtaining lawful benefits for themselves, but it gives no sanction to combinations, either of employers or employed, which have for their immediate purpose the injury of another.

The principles declared by this court in the cases referred to and stated in this opinion have the support of practically all the courts of the country. Inasmuch as this court has plainly declared the law upon the subject, it would be useless to cite the very numerous decisions to the same effect. Among them are *Martin* v. *McFall*, 65 N. J. Eq. 91; *Martel* v. *White*, 185 Mass. 255; *Ertz* v. *Produce Exchange*, 79 Minn. 140; *Jensen* v. *Cooks' and Waiters' Union of Seattle*, 81 Pac. Rep. 1069; *Loewe* v. *California State Federation of Labor*, 139 Fed. Rep. 71; *Berry* v. *Donovan*, 188 Mass. 353; *Casey* v. *Cincinnati Typographical Union*, 45 Fed. Rep. 135; *In re Debs*, 158 U. S. 564.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*

SCOTT and FARMER, JJ., dissenting:

The repeated expression of our dissenting views in cases of this character is justified by firm conviction that the *nisi prius* courts in such cases brought here for review have persistently exceeded the lawful limits of their power. Under the law as it stands no one can deny that the courts have the power to interfere between employer and employee by injunction, which may issue at the suit of either in proper case. It is the duty of persons enjoined to obey the injunction so long as it continues in force, save in instances where the court has proceeded wholly without jurisdiction, and for a violation of the injunction punishment may be adminis-

tered. The constitution of this State, however, provides, in substance, that no man shall be punished for crime except upon conviction by a jury, and that upon his trial he is entitled to meet the witnesses face to face. In a proceeding to punish for a violation of an injunction, where it is charged by the written accusation that a crime has been committed, courts of equity in cases relied upon by appellees have determined the innocence or guilt of the defendants without the intervention of a jury, upon *ex parte* affidavits, usually drawn in the words of the solicitor for the complaining party, where the defendants have no opportunity to cross-examine or even see the witnesses. While that course has been frequently approved, we yet hold that no reasoning, however strong, can disguise the fact that in pursuing such a course the court of chancery denies to the defendants their constitutional right of trial by jury and their constitutional right to be confronted by the witnesses against them.

Changing conditions in the industrial world constantly require us to make applications of existing laws to situations not before contemplated. Such varying conditions never change the law regulating the property rights of the employer nor the personal rights of the employee, in the absence of legislative action, but such rights continue as before, and may not be, by the judicial department of the government, either increased or diminished. To us the following language from our bill of rights seems apropos: "A frequent recurrence to the fundamental principles of civil government is absolutely necessary to preserve the blessings of liberty." It amounts to nothing to assert that laborers may organize for the purpose of bettering their condition in life while denying to them the right to do anything as an organization except those acts which could be as well done without organization.

We regard the decree of the court below as going a step farther than is warranted even by the latest precedents. Appellants sought to have the period of labor for compositors

in the printing shops of Chicago reduced from nine to eight hours per day, and for the purpose of bringing about this result a strike was instituted. The injunction forbids the striking workmen calling upon any of the employees of the complainants, at their homes or elsewhere, for the purpose of inducing them to leave the employ of the complainants.

Mere persuasion or like orderly inducement used by one laborer to lead another to quit the common employment, in order that the employer may be compelled to pay a higher wage or make the conditions of employment less irksome, is not unlawful. 18 Am. & Eng. Ency. of Law, (2d ed.) p. 86; *A. S. & W. Co.* v. *W. D. Union,* 90 Fed. Rep. 608; *C. S. Manf. Co.* v. *G. B. Ass.* 59 N. J. Eq. 49; *Krebs* v. *Rosenstein,* 66 N. Y. Sup. 42; *Rogers* v. *Evarts,* 17 id. 264; *People* v. *Kostka,* 4 N. Y. Crim. 429; *Master B. Ass.* v. *Damascio,* 63 Pac. Rep. 782; *Reynolds* v. *Everett,* 144 N. Y. 189; *Arthur* v. *Oakes,* 63 Fed. Rep. 310; *United States* v. *Kane,* 23 id. 748; *Union Pacific Railway Co.* v. *Reuf,* 120 id. 102; *Allis-Chalmers Co.* v. *Lodge,* 111 id. 264; *Levy* v. *Rosenstein,* 66 N. Y. Sup. 101; *Beaton* v. *Tarrant,* 102 Ill. App. 124.

In *London Guarantee Co.* v. *Horn,* 206 Ill. 493, we held that it is a violation of legal right to interfere with contractual relations recognized by law if there be no sufficient justification for the interference, and that competition in trade, employment or business is to be regarded as a sufficient justification for such interference. While every conflict of temporal interest cannot be regarded as competition, yet in the present instance the purpose of appellants was to secure for themselves or members of their union employment from the appellees and to exclude other persons from that employment. The competition was, in fact, between union and non-union workmen. The primary purpose of the appellants was, not to injure appellees, but to secure to themselves, under more favorable conditions, employment in the shops of appellees and to exclude others therefrom.

In *Doremus* v. *Hennessy,* 176 Ill. 608, we said: "Competition in trade, business or occupation, though resulting in loss, will not be restricted or discouraged, whether concerning property or personal service. Lawful competition that may injure the business of another, even though successfully directed to driving that other out of business, is not actionable. Nor would competition of one set of men against another set, carried on for the purpose of gain, even to the extent of intending to drive from business that other set, and actually accomplishing that result, be actionable, unless there was actual malice. Malice, as here used, does not merely mean an intent to harm, but means an intent to do a wrongful harm and injury."

In *London Guarantee Co.* v. *Horn, supra,* the fact that the law as there stated is not applicable to that phase of the present case which we are now considering was pointed out in these words: "If the only object of appellant had been to secure appellee's discharge for the purpose of obtaining his position for another, or for the reason that the employment of appellee by Arnold, Schwinn & Co. in some way conflicted with the right of appellant, or some organization to which it belonged, to obtain the same or similar employment, a very different question, and one not now before this court, would be presented, and *Allen* v. *Flood,* 67 L. J. Q. B. 119, and other cases of that character cited by the appellant, would then be worthy of greater consideration."

In our judgment competition such as here existed afforded sufficient justification for the use of persuasion, or other like peaceable method by appellants, to induce employees of appellees to leave their work, in order that better conditions for labor might be brought about in the shops of appellees.

We conclude that the decree herein should not be affirmed.