### KNAPP–MONARCH CO. v. ANDERSON et al.

No. 674.

District Court, E. D. Illinois.

May 28, 1934.

Kramer, Campbell, Costello & Weichert, of East St. Louis, Ill., for plaintiff.

Baker & Lesemann, of East St. Louis, Ill., for defendant.

## WHAM, District Judge.

This is a suit in equity wherein the plaintiff seeks injunctive relief against the defendants with whom the plaintiff is engaged in a labor dispute. The defendants are employees or former employees of the plaintiff, and are now on strike. The plaintiff is a corporation, organized under the laws of the state of Missouri, and operates in Belleville, Ill., a plant for the manufacture of electrical appliances. It employs approximately 550 workers. The defendants are residents of the state of Illinois.

Jurisdiction of the cause exists by reason of diversity of citizenship of plaintiff and defendants subject to the restrictions on such jurisdiction imposed by chapter 6, title 29, USCA (section 101 et seq.), known and sometimes referred to herein as the Norris Act.

The pertinent facts shown by the evidence are, in substance, as follows:

There has been a controversy over a period of several months between the plaintiff and the members of a labor union local to the plant known as Federal Labor Union No. 18274. This controversy has been taken by the parties before all available bodies for mediation, arbitration, or settlement, and every reasonable effort has been made by plaintiff to settle the dispute.

On Friday night, April 13, 1934, while the dispute was still pending before the St. Louis Regional Labor Board, and without notice to the plaintiff or its officials, the strike was called at a special meeting of said Local No. 18274. Since that time the members of said Regional Labor Board have personally intervened in an effort to bring about an amicable adjustment of the controversy but without success. Other serious but unsuccessful efforts have been made by the plaintiff to reach an agreement with the striking employees.

At said meeting of Local 18274, attended by approximately 200 of its approximately 300 members, the strike was voted to begin the next morning, and the members were instructed to report at the plant of plaintiff to do peaceful picketing without violence. Pursuant to said action on the part of the union, the plant was picketed on the morning of April 14, 1934, by a large number of the members of said union, including many of the defendants.

On Monday morning, April 16, the number of picketers had grown to a large assemblage of 250 or more, blocking the sidewalks, swarming over the roads and about the entrances to the plant. This continued throughout the day until the last of the workers had left the plant and in decreasing numbers on into the night and beyond 12 p. m.

Numerous acts of violence and intimidation occurred on Monday, increasing in frequence as the day progressed, and on Monday night, fearing further and increased violence the next day, the officials of the plant determined not to operate the plant on Tuesday. Notice of this action was sent out to the workers, but some failed to get the word and returned to the plant on Tuesday morning.

On Tuesday before the usual time for opening the plant large numbers of the striking employees were back at their job of what they termed and most of them, despite the violence of the day before, apparently believed was peaceful picketing. Soon a crowd similar in size to that of the day before was present. Employees who were not on strike and who had not received word that the plant would not reopen began to arrive, as did the usual traffic carrying materials, supplies, and food ordinarily used at the plant in the course of a working day. Again the striking employees blocked sidewalks, swarmed over the streets and about the entrances to the plant. Again acts of violence and intimidation occurred of a nature which confirmed the wisdom of the management in their decision to cease operations in order to avoid danger of violence to the employees who wished to and were willing to work.

On each day following Tuesday, April 17, until the date of the temporary restraining order herein, the picketing of the plant continued in large though decreasing numbers. In the meantime the plant was kept closed.

The evidence bore particularly upon the happenings in connection with the strike on the first three days, excluding Sunday. The conclusion that much violence and many acts of intimidation occurred on those days toward the employees who worked or wished to work is unavoidable. Without analyzing the evidence in detail, it will be sufficient for the purpose of this memorandum to point out the more pronounced instances of violence and intimidation.

The large crowd that was gathered about the plant on Monday morning while not more disorderly on the whole than such large assemblage of picketers bent on winning their strike are apt to be, were shouting, calling names, blocking the walks to the entrances, compelling workers going to the plant to go into the streets for a passageway. There the picketers gathered about them, following and urging them not to go back to work but to support the strike. In some instances, workers were told that they could go into the plant, but they would have to take the consequences when they came out at the end of the day. At times it became necessary for the management and officers of the law to aid in getting the workers safely into the plant. The picketers stopped trucks and cars going into the plant, gathering about them in large numbers, talking to the drivers and occupants sometimes persuasively, sometimes coercively. At times they packed themselves about the entrances, and the officers found it necessary to open the way for vehicles and workers entering the plant. Air was let out of the tires of workers' cars that were left on the outside of the plant.

The crowd of picketers was large on Monday afternoon when workers were leaving the plant, and the threats of the morning bid so fair to be made good that it became necessary to convey many of the workers away under guard. Certain of the cars carrying the workers were stoned, others were threatened, others were pursued in a dangerous and threatening manner by cars containing picketers. In certain instances when the workers left the cars in which they were conveyed from the plant they were set upon and assaulted or followed and threatened.

On Tuesday, with a crowd present similar to the day before though the plant did not open, further acts of violence and coercion occurred similar to those of the day before and calculated to intimidate those who would work and by duress rather than by peaceful persuasion prevent them from working.

Several of the individuals who are named as defendants actually committed or had an active part in the acts of violence, coercion, and duress mentioned above. Many of the others, pursuant to the plan formulated at the special meeting of the union on the night of April 13, were present and participating in the mass picketing when the acts of violence and intimidation occurred, and afterwards continued to participate in the mass picketing though they knew of, or had learned of, such acts of violence and coercion.

The overt acts of violence and intimidation were chiefly directed by the striking employees at the workers in the plant with obvious purpose to compel the closing of the plant by depriving it of the employees necessary to operate or by coercing the management into closing the plant in order to avoid danger to those who would work. No actual violence was directed toward the physical property of the plant, except in so far as the automobiles which plaintiff did not own but which they had rented and for which they were responsible were stoned and damaged as an incident to the campaign against the workers in the plant.

The officers and drivers of the Tubbesing Trucking Company which had the contract for all of the plant's trucking were permitted to truck material into the plant, but were coercively warned against taking any material out of the plant, for the obvious purpose of preventing the plaintiff from marketing its finished products and fulfilling its contracts.

At the inception of the strike, upon request of the officials of the Knapp-Monarch Company, several police officers of the Belleville police force were sent to the plant, and in varying numbers from two to seven were present there during the times the mass picketing was being conducted and the said acts of violence and intimidation were committed. The sheriff's office likewise on certain days detailed two deputies with instructions to cooperate with the Belleville police in handling the strike. These deputies did not disclose their presence to the plant officials, and apparently did little to help in any way. The testimony is conflicting with reference to the earnestness and effectiveness with which the police officers dealt with the situation.

All of the officers testified in the case as witnesses for the defendants, and each of them testified that with very minor exceptions he observed no acts of violence, coercion, or intimidation, and that the officers were constantly in complete control of the crowd. Likewise, many of the defendants and several other members of Local No. 18274 testified each with impressive uniformity that he had observed no acts of violence, coercion, or

intimidation and had heard no threats. In view of the convincing proof that there had been numerous acts of violence and not a few instances of unquestionable coercion and intimidation, one listening to the testimony of the officers and witnesses for the defense could scarcely fail to be struck with the thought that there appeared to be among them a co-operative emulation of the three legendary Oriental gods who would "see no evil, hear no evil and speak no evil." The only other reasonable explanation is that so large a crowd had been permitted to assemble about the plant that the acts of violence and intimidation were committed within the shelter of the crowd, so that neither the officers nor the other witnesses for the defense were able to observe them.

Though the evidence is conflicting as to whether the police officers actually saw, or were in position to see, the acts of violence and coercion that were committed or some of them, I am willing to find that the officers testified truthfully that they did not see the acts of violence, but I must further find that it was by reason of the fact that they were prevented from seeing by the large numbers of mass picketers and others whom the officers, contrary to their duty, as I conceive it, permitted to congregate in and about the plant and the entrances thereto. The latter finding leads inevitably to the further conclusion that the officers who were present and charged with the duty were either unwilling or unable to prevent violence and intimidation toward the employees who wished to work or to afford adequate protection to plaintiff's property. Whether such inability or unwillingness arose from misfeasance or from actual incapacity or whether it arose from a misconception of their duty and authority on the part of the officers and their superiors will be considered presently.

The jurisdiction of this court to issue a temporary injunction in a case of this nature is dependent on certain definite findings of fact by the court prescribed in paragraphs (a), (b), (c), (d), and (e) of section 107, title 29, USCA, as follows:

"(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;

"(b) That substantial and irreparable injury to complainant's property will follow;

"(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

"(d) That complainant has no adequate remedy at law; and

"(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection."

Under the evidence in this case, if the evidence required the finding specified in paragraph (e) above quoted, I would have no doubt of the duty of this court to make all the findings required by paragraphs (a), (b), (c), and (d). Undoubtedly, the unlawful acts of violence and intimidation toward the employees, agents, and patrons, and in a degree toward the physical property of the plaintiff and the threatened continuation of the same, has been made clear by the evidence.

The contention of counsel for the defendants that the evidence fails to show that substantial and irreparable injury to plaintiff's property has occurred or will follow is, in my judgment, based on an entirely too narrow view of the meaning of the term "property" as used in the act under consideration. It is true that the term "property right" as used in connection with the term "property" in the Clayton Act (section 20 [29 USCA § 52]) was dropped by Congress when the Norris Act (section 7 [29 USCA § 107]) was enacted. From this it does not follow that, before a court can find that "substantial and irreparable injury to complainant's property will follow," there must be evidence of threatened direct violent injury to or destruction of the physical property of the complainant. The term "property right" as used in the Clayton Act may have broadened or left less restricted the jurisdiction of the court to afford relief in cases of injuries to rights in the nature of property that were beyond the commonly understood meaning of property (Texas & N. O. R. Co. v. Brotherhood of Railway & Steamship Clerks, 281 U. S. 548, 50 S. Ct. 427, 74 L. Ed. 1034), but, in my opinion, it did not have the effect of narrowing the commonly accepted meaning of the term "property."

Both terms having been placed in the Clayton Act, they were apparently used by the courts without necessity or effort to distinguish between them. It is observed that

in the decision of the United States Supreme Court in Duplex Co. v. Deering, 254 U. S. 444, at page 465, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196, the business of manufacturing and disposing of goods is held to be a "property right," but no consideration is given to the question as to whether business of that character is "property." In American Steel Foundries v. Tri-City Council, 257 U. S. 184, at page 202, 42 S. Ct. 72, 76, 66 L. Ed. 189, 27 A. L. R. 360, the decision reads: "It has been determined by this court that the irreparable injury to property or to a property right, in the first paragraph of section 20, includes injury to the business of an employer, * * *" and cites Duplex Co. v. Deering, supra, thus indicating that the Supreme Court drew no distinction between the terms in those cases. Again, in the majority opinion in Truax v. Corrigan, 257 U. S. 312, at page 327, 42 S. Ct. 124, 66 L. Ed. 254, 27 A. L. R. 375, the restaurant business was declared to be a property right on the authority of Duplex Co. v. Deering, supra, while in the dissenting opinion of Justice Pitney, who had written the majority opinion in Duplex Co. v. Deering, supra, holding business to be a property right, appears the following statement: "That the right to conduct a lawful business, and thereby acquire pecuniary profits, is property, is indisputable." Page 347 of 257 U. S., 42 S. Ct. 124, 135. Again, in the dissenting opinion of Justice Brandeis in the same case at page 354 of 257 U. S., 42 S. Ct. 124, 137, we read: "The employer has, of course, a legal right to carry on his business for profit, and incidentally the subsidiary rights to secure and retain customers, to fix such prices for his product as he deems proper, and to buy merchandise and labor at such prices as he chooses to pay. This right to carry on business—be it called liberty or property—has value; and, he who interferes with the right without cause renders himself liable." Then Mr. Justice Holmes, likewise dissenting, ignoring the fact that business had been referred to in the majority opinion as a property right, contends with the idea that by calling a business "property" it is made to seem like land in a constitutional sense, and this he deemed to be untrue. All of which gives support to the thought that, when the Supreme Court and the Justices thereof in a measure used interchangeably the terms "property" and "property right" as they appeared in the Clayton Act without distinguishing the terms, no marked significance can be given to the fact that only the term "property" was retained in the Norris Act.

A study of the history of labor legislation shows that the scope and meaning of the term "property" as a foundation for equitable jurisdiction and relief has for many years been a focal point of debate and the objective of numerous proposed bills in Congress without any apparent progress having been made toward legislative definition or limitation. The Labor Injunction, Frankfurter and Greene, pp. 47, 48, 155, 157, 158, 207, 208.

"Property," as used in the Norris Act, must, it seems to me, receive precisely the same meaning that was given to it by the courts in well-considered cases of this character before the enactment of the Clayton Act. Without attempting a delimitation of the word "property," as used in the Norris Act in defining the jurisdiction of this court, I have no difficulty in arriving at the conclusion that it includes not only tangible property but the right to use that property.

The plaintiff does a seasonal business in certain respects, in that it manufactures electric fans and other seasonal electrical appliances. It has some large and numerous smaller contracts for such products with nation-wide wholesale and retail distributors, in which time is of the essence of the contract because of the seasonal nature of the goods. It has large quantities of materials on hand in preparation for the fulfillment of the said contracts which will become valueless or on which very substantial losses will be suffered if they cannot be manufactured and used in filling the special contracts for which such material was purchased and solely adapted. The plaintiff likewise has a fully equipped manufacturing plant. Without operation, the plant not only becomes useless and valueless but a heavy expense to the plaintiff. The only way the plant can be operated, the materials manufactured into finished products and disposed of is by the plaintiff being permitted to exercise its legal right to employ those who would work for that purpose. When, as in this case, the plaintiff is unlawfully deprived of this right by any unlawful conduct which intimidates, puts in fear, or otherwise by unlawful means causes those who would otherwise work for plaintiff to refrain from so doing, and is thereby deprived of its right to use or dispose of its property, there results a direct injury to the complainant's property within the meaning of the Norris Act defining the jurisdiction of this court. That such injury has resulted here and, if not prevented, will continue and will be substantial and irreparable in nature, can scarcely be disputed. Furthermore,

there was evidence here of the stoning of cars of which plaintiff had possession, from which it is reasonably inferable that other such violence to the physical property of the plaintiff will occur unless prevented.

I am of the firm opinion that the evidence here places upon this court the duty of issuing a temporary restraining order against all or part of the defendants, unless I find myself unwilling to find from the evidence as it now stands that the public officers charged with the duty to protect plaintiff's property are unable or unwilling to furnish adequate protection.

■ Undoubtedly, they did fail to furnish such adequate protection during the early days of the strike.

Both Mr. Belzing, chief of police, Belleville, Ill., and Mr. Munie, sheriff, St. Clair county, Ill., testified at the hearing as witnesses for the defense. Questioning brought out the fact that it was their understanding, in substance, that mass picketing is entirely lawful, and, as officers charged with the duty of protecting personal and property right from unlawful invasion and as conservators of the peace, their only recourse when strikes occur is to attend where such mass picketing is in progress to prevent riots, traffic jams, fighting, assaults, and other like violent conduct without any right to disperse the crowd unless it engages in rioting or mob violence. Each of them expressed a willingness and desire to co-operate with the other, and insisted that with such co-operation they would be able to control the situation at the defendant's plant so as to afford adequate protection to plaintiff's property. Each of them appeared to be in earnest in his testimony. Each admitted a grave handicap in the fewness of available officers for strike duty. Each of them further stated, in substance, that, if he were advised that mass picketing is unlawful, he would be willing and able to prevent it, and thus render easy the handling of the situation at the plant to the end that the probability of violence and intimidation would be reduced to a minimum and adequate protection to plaintiff's property made easy.

From the testimony of Chief Belzing and Sheriff Munie, alluded to above, I am at this time impressed with the thought that the failure to furnish adequate protection to the plaintiff was a result of their misconception of their duty and authority in such cases rather than an unwillingness or inability so to do.

■ An examination of the Norris Anti-Injunction Act impresses one strongly with the thought that it was the purpose and intent of Congress that, though all other jurisdictional and necessary facts be present, a federal court should not step in by injunction until it becomes apparent that the local authorities are actually unable or unwilling to protect plaintiff's property. The act is comparatively new, and this is the first time this court has been called upon to construe its meaning and effect in a labor controversy in this district. There has been no previous opportunity to evaluate the willingness and ability of the local law-enforcing authorities adequately to deal with a situation of this character or to arrive at a common ground of understanding with them, if possible, as to what amounts on their part to adequate protection of property in a case of this kind. In view of these facts, and in view of the emphatic testimony of the heads of the city and county authorities that they are both willing and able to give plaintiff's property and employees who wish to work all the protection the law entitles them to, I am loath to make a finding at this time that such authorities are either unable or unwilling to do this, until further trial is afforded.

Though it is not my duty to instruct the state, county, and city authorities with reference to their official duties, and they are in no sense bound by anything I may here say that may bear thereon, nevertheless, it may be helpful if I briefly set forth my views on the state of the law with regard to picketing in the state of Illinois which has a direct bearing on the duty and authority of the local authorities.

Illinois has no statute similar to the Norris Act, but since 1925 has had a statute which is substantially the same as the Clayton Act (Smith-Hurd Rev. St. Ill. 1933, c. 48, § 2a). The meaning and effect of that statute has been directly dealt with in two Illinois cases that have come to my attention. Ossey v. Retail Clerks' Union, 326 Ill. 405, at page 415, 158 N. E. 162, 163; Roesch Enamel Range Co. v. Carbine, 247 Ill. App. 248. These cases also deal with the subject of picketing.

In Ossey v. Retail Clerks' Union, supra, the appeal was from orders of the superior court of Cook county adjudging appellants guilty of contempt for violating the provisions of an injunction issued by that court restraining the defendants in the suit "(a) from picketing or maintaining any picket or pickets at or near any of the buildings in which the complainants operate their busi-

nesses; (b) from following, stopping involuntarily, assaulting, beating, threatening, menacing, intimidating, harassing, molesting, or interfering with the complainants, or any person employed by them, or who seeks to enter their employment, or who does or seeks to do business with them; (c) from calling upon or talking to any employee of the complainants against the manifest will of such employee; (d) from applying to any employee of the complainants any profane, insulting, humiliating, or indecent epithet, name, term, or language; (e) from soliciting or inducing any person employed by the complainants to quit such employment; (f) from molesting, injuring, trespassing upon, or interfering with any property owned, operated, or used by the complainants, or by any person employed by, or who does or seeks to do business with, the complainants; and (g) from threatening or participating in the doing of any of the things forbidden."

The appellants sought a reversal on the ground, among others, that the injunction was invalid under the provisions of the Illinois statute (Laws of 1925, p. 378, Smith-Hurd Rev. St. Ill. 1933, c. 48, § 2a—same as Clayton Act). I quote at considerable length from the court's opinion (pages 415–417 of 326 Ill. 158 N. E. 162, 166), whereby the orders of the lower court were affirmed:

"The appellants, by their answers to the petition, admitted that they had picketed the complainants' store. The evidence clearly shows that the appellants obstructed the entrances to the store, and not only dissuaded customers from entering it but threatened them with harm if they did enter. The picketing continued more than six weeks. On the morning after it began a brick was thrown through one of the show windows. Later a piece of iron was found inside of and near a broken window, and a fight occurred, in which Winnick, among others, took part. Pedestrians, employees and customers were intimidated. As the result of the picketing, and while it was in progress, the complainants' business was reduced at least one-half.

"The statute upon which the appellants rely for immunity is substantially the same as section 20 of the Act of Congress of October 15, 1914, known as the Clayton Act (38 Stat. 738 [29 USCA § 52]). That section forbids the granting of a restraining order or injunction by a federal court or judge in labor controversies prohibiting 'any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuad-ing others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do.' Under these provisions the Supreme Court of the United States held in American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 42 S. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360, that picketing in groups of from 4 to 12 near an employer's manufacturing plant during a strike, accompanied by attempts at persuasion or communication with persons entering or leaving the plant, resulting in intimidation of employees and prospective employees, and of obstruction of and interference with the business of the employer, was unlawful and might be enjoined. The court said: 'The name "picket" indicated a militant purpose, inconsistent with peaceable persuasion. The crowds they drew made the passage of the employees to and from the place of work one of running the gauntlet. Persuasion or communication attempted in such a presence and under such conditions was anything but peaceable and lawful. When one or more assaults or disturbances ensued they characterized the whole campaign, which became effective because of its intimidating character, in spite of the admonitions given by the leaders to their followers as to lawful methods to be pursued, however sincere. Our conclusion is that picketing thus instituted is unlawful and cannot be peaceable, and may be properly enjoined by the specific term because its meaning is clearly understood in the sphere of the controversy by those who are parties to it.' In support of its view the court cited numerous authorities, among them Barnes & Co. v. Typographical Union, 232 Ill. 424, 83 N. E. 940, 14 L. R. A. (N. S.) 1018, 13 Ann. Cas. 54, and Franklin Union v. People, 220 Ill. 355, 77 N. E. 176, 4 L. R. A. (N. S.) 1001, 110 Am. St. Rep. 248.

"The complainants' business is a property right, and free access to their places of business by the complainants, their employees and customers is an incident to that right. Truax v. Corrigan, 257 U. S. 312, 42 S. Ct. 124, 66 L. Ed. 254, 27 A. L. R. 375; Anderson & Lind Manf. Co. v. Carpenters' Council, 308 Ill. 488, 139 N. E. 887; Mathews v. People, 202 Ill. 389, 67 N. E. 28, 63 L. R. A. 73, 95 Am. St. Rep. 241. The appellants'

intention to inflict loss upon the complainants and the consequent serious loss are clear. To accomplish their purposes the appellants resorted to obstruction, intimidation and violence. Even if the validity of the act invoked by the appellants be assumed, a question not now decided, it afforded them no immunity for their acts."

And examination of Justice Barry's opinion in Roesch Enamel Range Co. v. Carbine, supra, discloses that, being called upon to pass upon the question as to what constituted a violation of an injunction which prohibited "unlawful picketing," he was of the opinion that all picketing is not necessarily unlawful. Having referred to the Clayton Act and its adoption into the statutory law of Illinois, he said:

"Each of these acts expressly prohibited the issuance of a restraining order or injunction in certain enumerated cases. Some of the things therein referred to would ordinarily be regarded as falling within the term 'picketing.' The acts indicate that congress and the legislature were of the opinion that there may be such a thing as peaceful and lawful picketing. In American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184 [42 S. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360], the court used language which seems to recognize the fact that all picketing is not unlawful. The court said: 'Each case must turn on its own circumstances. It is a case for the flexible remedial power of a court of equity which may try one mode of restraint, and, if it fails or proves to be too drastic, may change it. We think that the strikers and their sympathizers engaged in the economic struggle should be limited to one representative for each point of ingress or egress in the plant or place of business, and that all others be enjoined from congregating or loitering at the plant or in the neighboring streets by which access is had to the plant; that such representatives should have the right of observation, communication and persuasion, but with special admonition that their communication, arguments and appeals shall not be abusive, libelous or threatening, and that they shall not approach individuals together but singly, and shall not in their single efforts at communication or persuasion, obstruct an unwilling listener by importunate following or dogging his steps. This is not laid down as a rigid rule, but only as one which should apply to this case under the circumstances disclosed by the evidence, and which may be varied in other cases. * * * The purpose should be to prevent the inevitable intimidation of the presence of groups of pickets, but to allow missionaries.' "

It will be observed that in both of the mentioned Illinois cases the courts relied heavily on the decision of the United States Supreme Court in American Steel Foundries v. Tri-City Central Trades Council, supra, and, in effect, adopt the law relating to picketing therein laid down as the law in Illinois. The substance of the law on picketing to be gathered from all of these decisions is that any picketing which serves in any way to intimidate or in any way interfere with or affect the free exercise of the right to work of those who wish to work is unlawful. It is pointed out by the United States Supreme Court, and quoted as the law by the Illinois Supreme Court, that even persuasion or communication attempted in a crowd of picketers is anything but peaceable and lawful.

From no source of the law in Illinois can I find any support for the proposition that mass picketing is lawful and must be permitted as a matter of lawful right in Illinois. In my judgment, it was because of a misconception of the law on this point that the local authorities were unable to protect the employees of the plaintiff from violence, coercion, and intimidation. It may be pointed out that, while the Clayton Act has been made the law of Illinois, the Norris Act has not and in no way affects or limits the jurisdiction or authority of the state courts and officers in Illinois.

I may say also that the very fact that Congress has refrained from using the word "picketing" in the Norris Act in defining and limiting the jurisdiction of the courts of the United States indicates the congressional intention to leave in those courts jurisdiction to restrain, if necessary, any picketing of a coercive, intimidating character. American Steel Foundries v. Tri-City Central Trades Council, supra. As was pointed out in the case just cited, mass picketing, or picketing in crowds, inevitably results in intimidation or violence or both. The evidence in the case before the court bears out the truth of that statement.

While the striking employees of the plaintiff have a lawful right not only to strike but to use every lawful effort to win the strike by peacefully persuading other employees to join them, any act on their part that serves to intimidate or put in fear employees or other persons who want to work for the plaintiff is unlawful. That is true whether such fear and intimidation results from violence, threats, or force of numbers. The local authorities undoubtedly are authorized by law

to prevent any unlawful act. Believing that they are so authorized here, and being unwilling to find, in view of the testimony of the chief law enforcing officers, that they are unable or unwilling to afford the property of the plaintiff adequate protection, it would seem that the plaintiff's petition for a preliminary injunction must be denied.

The petition for a temporary injunction will be, and is hereby, denied, and the temporary restraining order which by agreement has been permitted to continue in force during the pendency of this litigation should be, and is hereby, dissolved.