EDITORIAL "EL IMPARCIAL, INC.," Plaintiff and Petitioner, v. BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS, LOCAL No. 901 ET AL., Defendants and Respondents.

No. 12826. Submitted September 14, 1960.—Decided March 3, 1961.

*José G. González, Benicio Sánchez Castaño, Eduardo Negrón Rodríguez* and *Félix Ochoteco, Jr.* for petitioner. *George L. Weasler* for respondents.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

The petitioner, "El Imparcial, Inc.", filed a petition for a preliminary, and later permanent, injunction before the Superior Court, San Juan Part, against the respondents herein. Petitioner alleged under oath that it is engaged in the publishing and sale of the newspaper "El Imparcial" which circulates daily in and without Puerto Rico, with editing offices, plant and machinery located at 450 Comercio Street, corner to Nolasco Rubio Street, in the city of San Juan, and that the respondent Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, Local No. 901, is a labor union according to the National Labor Relations Act and to the labor laws of Puerto Rico, its officers in Puerto Rico being respondents herein Frank Chavez, Federico Virella, Jaime Amador and other unknown persons, and co-respondents José Gil de Lamadrid, Humberto Trías, Pablo Ojeda, Roberto Agrinsoni, Frank Montoya, Cruz Roque Vicéns, Esli González, Eddie Vélez, Joaquín Oliveras, and Rafael López Cepero, who have specifically participated in the events hereinafter set forth in the petition; that on May 24, 1960, the respondent labor union ordered a strike of the personnel in the editing offices of the newspaper "El Imparcial", 16 employees of the petitioner out of a total of 44 members of its editing offices having complied with said order, and that the

respondents based their order of strike on the fact that an employee of the above-mentioned editing offices of the newspaper had been fired.

To analyze the question in controversy we must set forth in detail the facts alleged by the petitioner as grounds for the issuance of an injunction, to wit: that the respondent labor union, through its officers, employees and agents and the persons mentioned above have committed, or participated in, or instigated others to commit, acts of violence, and that they continued to commit such acts as uninterruptedly keeping pickets *en masse* right in front of the main entrance of the building of the newspaper "El Imparcial" and at the rear entrance, in such a way that they have obstructed and did obstruct the free entrance to petitioner's premises, and the picketers frequently used vile and offensive language, insulting to the morality, honesty and integrity of the employees, officials and agents of the petitioner, provoking them with abusive epithets and challenging them to fight through the use of force and violence, such pickets being formed in their majority by persons who were not members or employees of the respondent and alien to petitioner's group of employees; that the respondents created, while maintaining said pickets, an atmosphere of violence and assault both against the directors and employees of the petitioner as well as against the public who has tried to enter its premises, and that due to said atmosphere of violence created by the respondent and its directors, associates and supporters, a series of violent attacks took place in front of petitioner's building, to wit, personal assaults committed by the respondents on petitioner's employees at different times and on different dates. Likewise, that while maintaining said pickets, the respondent labor union, acting through its officers, agents and members, and persons alien thereto, but following the instructions of said union, have committed on different dates, acts of violence which are enumerated, in front of petitioner's con-

cern causing damages to petitioner's property and interests, to its officers and employees; that in addition to the acts of violence already mentioned, the labor union, through its officers and agents and the other respondents, continued committing, participating and instigating new assaults and batteries upon petitioner's officers and employees and property damages and that through the same unlawful means and through others such as threats to inflict serious bodily injury upon said employees and their families, they have prevented and did prevent employees of the petitioner, who had nothing to do with the strike and who wished and attempted to go to their work, from risking to do so lest they receive bodily injury or even death; that such state of violence has prevented and did prevent petitioner from editing, publishing and distributing the newspaper, the amount of the losses thus occasioned being not less than $2,500 daily; that the respondents threatened to continue committing acts of violence and that there was every reason to believe that said acts of violence would continue being committed unless they were prevented by judicial action; that the petitioner has sustained and is still suffering substantial and irreparable injuries due to respondent's unlawful conduct and to the intimidation, threats and coercion exercised not only by them but also by alien persons recruited by them; that the balance of convenience was in favor of the issuance of the injunction since greater injury would be inflicted upon the petitioner by its denial than would be inflicted upon the respondents by the granting thereof, and that the plaintiff had no remedy at law as adequate and efficient as the relief sought herein.

Aside from the facts set forth herein, the petitioner alleged having procured the aid of the Conciliation Bureau of the Department of Labor, the respondent union having refused to submit to conciliation and it also alleged what constitutes the gist of the issue now before us in this

appeal, that the public officers in charge of protecting the property of the petitioner and the life of its officers and employees notwithstanding their efforts to avoid said acts of violence, have been unable and are actually unable to furnish them an adequate and full protection. According to the allegations stated above, the petitioner requested the Court to issue an injunction against the respondents prohibiting them from committing the acts of violence already mentioned and any other act involving threats, intimidation or coercion against petitioner's employees, its property or the property used by it, and against persons and clients visiting its premises; from using propaganda or any other means insulting to the morality, honesty and integrity of its employees, officers and agents who wished to remain in their jobs, as well as from establishing and maintaining pickets in such a way as to obstruct the free access to and egress from its premises and which are not peaceful and consistent with the rights which the respondents may exercise according to the law in a labor dispute.

The parties having been summoned to a hearing held on June 15, 1960, the respondents filed, on said date, an answer admitting some of the facts and denying, for lack of information, the acts of violence alleged. They set up among other affirmative defenses the lack of jurisdiction of the court to entertain this case, and that the acts alleged, if they had been committed, were committed or instigated by another labor organization, which alone was responsible for said acts. Regarding this allegation, the respondents requested leave to file and did submit with their answer, a third-party complaint alleging that if what the petitioner had stated was true, the only one responsible would be the third-party respondent, Seafarers International Union of North America, and requesting that the latter be ordered to answer the allegations contained in the petition for injunction and that judgment be rendered making it responsible. In a

motion for dismissal of the action for lack of jurisdiction, the respondent labor organization, calling itself Teamsters, alleged that it represented some of petitioner's employees who went on strike while involved in a labor dispute caused by the wrongful discharge of employee Jesús Rodríguez-Benítez for his affiliation and activities in favor of respondents Teamsters, and that this wrongful discharge was being investigated by the National Labor Relations Board; that petitioner itself had preferred charges before the National Labor Relations Board against the alleged acts of violence as violations of the federal statute which was being investigated by the regional office of the Board; that the petitioner had an adequate and effective remedy at law to avoid said acts of violence through the National Labor Relations Act, and that during the strike called by the Teamsters, the Asociación de Fotógrafos, Camarógrafos y Técnicos de Prensa de Puerto Rico, authorized representative of the employees of the photographic department of "El Imparcial", joined the strike, and said Asociación had preferred charges before the National Labor Relations Board against the petitioner alleging that the latter unlawfully refused to negotiate with it. Copies of the above-mentioned charges preferred by both parties before the National Board were incorporated into the record.

The stenographic record of the proceedings which took place during the hearing that was held shows, as regards the third party complaint, that the trial court held that the third-party complaint did not lie at that stage of the proceedings, since it would require the summoning of the third party and to allow time for its allegations which would strip the preliminary injunction proceeding of its summary nature, and it granted respondents the right to raise this question if the case went to a hearing for a permanent injunction. However, the Court stated that if it appeared from the evidence that third persons alien to the respondents were the

persons who committed those acts, the petition would have to be dismissed.[1]

■ With regard to the jurisdictional question, respondents' position during the hearing was to the effect that the National Labor Relations Board was the organization specifically designated by Congress to settle labor disputes although they subsequently admitted that if said National Labor Relations Board did not assume jurisdiction, the petitioner may have the right to resort to the Superior Court on the ground that it did not have an adequate remedy. The trial court dismissed the jurisdictional question. The defendants-respondents have not insisted before this Court on the lack of jurisdiction of the trial court to entertain this case, but since our own jurisdiction is also involved, we shall state, without further arguments, that it having been alleged, and better still, proved beyond any doubt that unlawful acts of force and violence were committed, even if it was during a labor dispute, and even though petitioner's company falls within the provisions of the National Labor Relations Act, the jurisdiction of the Superior Court, which it correctly assumed, is fully sustained. See: *Allen-Bradley Local* v. *Board*, 315 U.S. 740; *Hotel Employees* v. *Sax Enterprises*, 358 U.S. 270, 271; *Youngdahl* v. *Rainfair, Inc.*, 355 U.S. 131, 137, 138; *Auto Workers* v. *Wisconsin Board*, 351 U.S. 266, 272–274; *United Workers* v. *Laburum Corp.*, 347 U.S. 656, 663–665; *Garner* v. *Teamsters Union*, 346 U.S. 485, 488; *Automobile Workers* v. *O'Brien*, 339 U.S. 454, 459.

---

[1] It is not necessary that we stop to examine whether a third-party complaint lies in a proceeding for a preliminary injunction under Act No. 50 of August 4, 1947, which applies here. It is evident that according to the allegations made in their third-party complaint, the respondents assumed to place on another union the responsibility for the acts charged against them in the complaint, which they also did in their own answer by way of an affirmative defense. It is obvious, then, that the former decision of the Court as to the third-party complaint regarding the preliminary injunction, did not prevent them from offering evidence to substantiate such affirmative defense, which they did not do.

And see: *Truax* v. *Corrigan*, 257 U.S. 312. *Cf. Plumbers' Union* v. *Door County*, 359 U.S. 354, 357 (footnote 5) ; *San Diego Unions* v. *Garmon*, 359 U.S. 236, 247–248 and footnote 6; *De Veau* v. *Braisted*, 363 U.S. 144, 147, 151–152; *Automobile Workers* v. *Russell*, 356 U.S. 634, 640; *Weber* v. *Anheuser-Busch, Inc.*, 348 U.S. 468, 476–477; *Labor Board* v. *Rice Milling Co.*, 341 U.S. 665, 672; *Building Service Union* v. *Gazzam*, 339 U.S. 532, 537; *Auto Workers* v. *Wisconsin Board*, 336 U.S. 245, 252–253; *Drivers' Union* v. *Meadowmoor Dairies, Inc.*, 312 U.S. 287, 292–295. *Teamster Union* v. *Vogt, Inc.* 354 U.S. 284, 289. See also the following decisions by state courts: *Southern Bus Lines* v. *Amalgamated Ass'n etc.*, 38 So.2d 765, 770 (Miss.) ; *General Bldg. C. Ass'n* v. *Local Unions No. 542, etc.*, 87 A.2d 250, 254–255 (Pa.), and Annotation in 32 A.L.R.2d 829; *McCarroll* v. *Los Angeles County Dist., etc.*, 315 P.2d 322, 332 (Cal.), *Cert. denied* 355 U.S. 932; *Lindsay* v. *Teamster Union*, 97 N.W.2d 686, 693–694 (N.D.) ; *Taylor Fibre Co.* v. *Textile Workers Union of America*, 151 A.2d 79, 81–82 (Pa.) ; *Minor* v. *Building & Construction Trades Council*, 75 N.W.2d 139, 144–147 (N.D.) ; *Mc Lean Distrib. Co.* v. *Brewery & Bev. Drivers, etc.*, 94 N.W.2d 514, 520–521 (Minn.), *cert. denied* 360 U.S. 917. These authorities unquestionably reaffirm the principle that unlawful acts of violence, even if they occur during a lawful labor dispute covered by the federal legislation on labor relations, do not come within the sphere of said legislation nor are they protected by the same, the primary duty of local authorities being the maintenance of order and of public safety.

█ We shall now turn to the merits of the case. By Act No. 50 of August 4, 1947, 29 L.P.R.A. § § 101–109, the Legislative Assembly of Puerto Rico deprived the courts of the authority to issue injunctions in cases involving or growing out of a labor dispute, except in the way strictly allowed

by the provisions of said Act.[2] Section 2 deprived the courts of jurisdiction to issue any preliminary or permanent injunction or restraining order, prohibiting any person or persons participating or interested in a labor dispute from doing, whether singly or in concert, among others, any of the following acts: (a) Ceasing or refusing to perform any work or to remain in any relation of employment; (b) Becoming or remaining a member of any labor organization; . . . . . (e) Giving publicity to the existence of or the facts involved in any labor dispute, whether by advertising, speaking, patrolling, or by any other method *not involving fraud or violence;* (f) Assemblying *peaceably* to act or to organize or to act in promotion of their interests in a labor dispute; . . . . . (i) Agreeing with other persons to do or not to do the acts heretofore specified; and (j) Advising, urging, or otherwise promoting or inducing, *without fraud or violence,* the acts heretofore specified.

According to § 5 of Act No. 50, no court of Puerto Rico shall have jurisdiction to issue an injunction in any case involving or growing out of a labor dispute against any per-

---

[2] Act No. 50 of August 4, 1947, was an almost literal adoption by our Legislative Assembly of the Norris-LaGuardia Act of 1932, 29 U.S.C.A. § § 101–115, which deprived the courts of the United States of their equitable jurisdiction to issue injunctions in cases involving labor disputes, except in the strictly limited way in which Congress allowed them to continue exercising such authority. The situation then prevailing, with all its effects and projections in the national economy and in the desirable labor management relations, which induced Congress to adopt such a drastic measure limiting the power of the federal courts, appears in its shocking reality from the spirited debates that took place in Congress during the discussion of said act. Congressional Record, Vol. 75, pp. 5462–5515 (House); pp. 4502–4511, 4618–4630, 4676–4696, 4754–4761; 4762–4780, 4914–4920, 4927–4939, 4996–5019 (Senate). An examination of these debates clearly shows that historically, the situation which the Norris-La Guardia Act intended to correct did not exist here. However, in the absence of any legislative history of the Bill which later became Act No. 50, we must conclude that the statute was adopted in 1947 for the same purposes of public policy as the ones contained in § 2 of the Norris-La Guardia Act, 29 U.S.C.A. § 102, to protect organized labor and with the interpretation given by the courts to similar provisions of this statute.

son or persons participating or interested in such dispute, except after hearing the testimony of witnesses in open court in support of allegations made under oath, and unless the court makes the following findings of fact:

(a) that *acts of fraud or violence* have been threatened and will be committed unless restrained, or said acts have been and will continue to be committed unless restrained; but no temporary injunction or restraining order shall be issued on account of any threat or act of fraud or violence, except against the person or persons or association or organization making the threat or committing the act of fraud or violence or actually authorizing the same after full knowledge thereof;

(b) that substantial and irreparable injury to complainant's physical property will result;

(c) that as to each item of relief sought on each allegation, greater injury will be inflicted upon the complainant by the denial of relief than will be inflicted upon the defendants by the granting of relief;

(d) that complainant has no other adequate remedy at law; and

(e) that the public officers charged with the duty to protect the property of the complainant are unable or unwilling to furnish adequate protection.

Having received the evidence, all of which was offered by petitioner only, the trial court held as satisfactorily established that some disputes arose between the company and some of its employees in relation to their employment contracts and that said disputes culminated in a strike called by said employees which began on May 24 of the present year, that as part of the activities of the strike pickets were established from that date in front of the building occupied by petitioner, which pickets had been maintained without interruption by some of petitioner's employees and by persons identified as members of or affiliates to the respondent labor

organization known as the Teamsters Union, and later by persons identified as members of or affiliates to another labor union known as Seafarers International Union and that as a result of the strike and of the pickets established there, the publication of the newspaper "El Imparcial" ceased from May 30 until June 13, 1960, on which date its publication was resumed with a reduced number of pages. The trial court concluded from the evidence, that from the pickets and the persons sympathizing with the strike individually, respondents herein, there arose such incidents as assaults on petitioner's employees, insults to the Director of the company, damages to a window of the building occupied by said company and damages to an automobile belonging to the Director, and that on some occasions they attempted to prevent and did prevent the entrance to the building of petitioner's employees who had remained in their jobs; they were insulted and the food which was occasionally sent to them from outside was ruined. Occasional attempts were also made to prevent the entrance to the building of persons who did business with the petitioner and with other companies and persons occupying said building. The police officers stationed there were at times the victims of insults and provocations.

On the other hand, the trial court was of the opinion that the police had furnished protection to the petitioner and had carefully maintained the order in front and about the building occupied by "El Imparcial"; that in the instances in which assaults or injury to the property took place, the police promptly and efficiently proceeded "to arrest the guilty persons and to submit them to judicial action," and that the police intervention was efficient insofar as it allowed for the resumption of the publication and distribution of the newspaper and inasmuch as the individual acts of violence were considerably reduced. Finally, it concluded that the acts of violence which occurred lately (the judgment of the

Superior Court was rendered on June 17, 1960) were not directed against the petitioner but that they occurred between the members and persons affiliated to the Teamsters Union and said seamen union. In view of these conclusions, the trial court decided that even if the established facts should meet requisites (a), (b), (c) and (d) of § 5 of Act No. 50 of 1947, mentioned above, the evidence had not met requisite (e), and it declared itself without jurisdiction on the merits to entertain the preliminary injunction requested.[3] From this decision the petitioner filed the appeal now before us pursuant to the special provisions of § 8 of said Act.

But before we consider the merits of the judgment appealed from, we must first dispose of a previous aspect of the case, also of a jurisdictional nature, as to which the trial court did not make any conclusion or statement whatsoever, and which has not been discussed before us by the parties either. We refer to the provision contained in § 6 of Act No. 50 to the effect that: "No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation fixed by the laws involved in the labor dispute in question, or who has failed to make every effort to settle such dispute either by negotiation or with the aid of the Conciliation Service and voluntary arbitration." As it may be seen the preceding provision constitutes an absolute bar to the granting of an injunction in cases involving labor disputes unless the complainant has assumed a conciliatory attitude and has performed the acts specified therein to settle the dispute. Regarding a similar provision contained in the Norris-La Guardia Act, 29 U.S.C.A. § 108,

---

[3] There is not the least doubt that this case involves a labor dispute according to the definition of said term in § 9 of Act No. 50, although later a rival labor union intervened therein, the provisions of said law being then of strict application. Cf. *Negro Alliance* v. *Grocery Co.*, 303 U.S. 552; *Milk Wagon Driver's Union* v. *Lake Valley Co.*, 311 U.S. 91; *Allen Bradley Co.* v. *Union*, 325 U.S. 797, 805 (n. 11), 807 (n. 12); *Telegraphers'* v. *Chicago & N. W. R. Co.*, 362 U.S. 330; *Marine Cooks* v. *Panama SS Co.*, 362 U.S. 365.

a conflicting view has existed from the beginning among the courts as to whether it applies or not in cases involving the commission of unlawful acts of violence. If this provision were applicable in cases where the relief is sought on the basis of acts of violence, it would not be sufficient for the court to make all the findings of facts provided in § 5. It would still be precluded from granting the relief unless it were proved that the complainant has made every effort to settle such dispute either by negotiation, conciliation or voluntary arbitration. The Supreme Court of the United States, in *Brotherhood of Railroad Trainmen* v. *Toledo, P. & W. R. Co.*, 321 U.S. 50 (1944), almost leaves no room to doubt that the above-mentioned provision of the Norris-La Guardia Act, similar to § 6 of our act, applies and it must be complied with before injunction is granted even in those cases where the commission of unlawful acts of violence has been invoked.[4] However, this decision admits that there may be some exceptions where the relief may be granted although the petitioner has not complied with said requisite. What these exceptions may be and the extent or degree to which the negotiations for settlement should be made, according to the circumstances of each case, is not clearly established. For a discussion of this problem in its different aspects, see the Annotation in 150 A.L.R. 819, following the case of *Brotherhood of R. Trainmen* v. *Toledo, etc.*, and the cases cited therein. See also *J. M. Michael & Co.* v. *Iron Workers Local, etc.*, 173 Fed. Supp 319, 325–326 (1959).

---

[4] In the case of *Brotherhood of R. Trainmen* v. *Toledo P. & W. R. Co.*, the Railway Labor Act of 1934, 48 Stat. 1195, was involved in the labor dispute, and it provided for the direct negotiation of the dispute and for mediation and voluntary arbitration between the parties. The employer negotiated directly with the employees and engaged in mediation with them, but it repeatedly refused to submit to voluntary arbitration, while the Union agreed to it. The Court stated that if the employer had submitted to arbitration, it would have averted the strike, the violence which followed, and the need for an injunction. The acts occurred in December, 1941, when a national emergency arose by the attack on Pearl Harbor.

The evidence before us (Record pp. 12–20) establishes that on June 1, 1960, several days after the strike had been called and after acts of violence were being committed, and before the present appeal was filed on June 9, the petitioner, trying to find a solution to this labor dispute, personally requested the services of Mr. Adolfo D. Collazo, the Director of the Conciliation and Arbitration Bureau; that Mr. Collazo contacted Mr. Chavez, the representative from the Teamsters Union and invited him to a meeting to be held on June 2, at which three representatives from this labor organization and representatives from the petitioner were present; that there was also another conciliator from the Department of Labor and that the meeting did not succeed in its objectives because the representatives from the Union left alleging that "El Imparcial" had not attended in good faith since it had preferred charges against said Union; that the conciliator informed them that they should make every possible effort to settle the problem and someone, a representative from the company, also declared that in discussing the problem they may reach an agreement. The representatives from the Union got up and were ready to leave and Mr. González, attorney at law, as representative of the petitioner, invited them to continue with the meeting, that they may possibly settle the problem by discussing it; that the representatives of the petitioner also requested them to set forth their demands and to state what they wanted, but that the representatives of the Union insisted on leaving and left. The last ones to leave the premises where the meeting was being held were the representatives from "El Imparcial."

In harmony with the restrictive spirit of Act No. 50 against the granting of injunctions in this type of cases, we now assume the position that § 6 of said Act equally applies to those cases in which the commission of acts of violence is invoked as basis for requesting this remedy, and that, therefore, the provisions of § 6 should be complied with as a con-

dition precedent to the issuance of a restraining order, without it being understood that we are now stating our view with regard to the position to be assumed by us in other circumstances, or where labor-management relations of another character are involved, and state, for present purposes and with regard to the preliminary injunction requested, that the record shows that the petitioner substantially complied with the efforts to reach a conciliation and settlement of the dispute as required by § 6 of Act No. 50. Having disposed of this aspect of the case, we shall now consider the judgment rendered by the Superior Court.

As we stated above, the trial court declared itself without jurisdiction on the grounds that the requisite provided in paragraph (e) of § 5, "That the public officers charged with the duty to protect the property of the complainant are unable or unwilling to furnish adequate protection" had not been proved. The petitioner does not argue that the police was unwilling to furnish them protection and, obviously, the record would not establish the contrary, but it does maintain that notwithstanding the desire and willingness of the peace officers to that effect, the evidence showed that they were unable to furnish a full and adequate protection.

Captain Luis M. Pérez, a police officer, testified that he had witnessed several assaults and acts of violence committed on different occasions by the respondents Humberto Trías, Cruz Roque Vicéns and José Gil de Lamadrid on the persons of petitioner's employees, without any provocation on their part, some of these assaults having occurred at the very entrance of the building of "El Imparcial". These acts occurred near the peace officers, and notwithstanding the immediate arrest of the transgressors, they were repeated by the same persons. He identified other respondents as persons who participated in the strike and who directed it, and he stated that they belonged to the Teamsters Union. The witness testified as to some insulting phrases which were

shouted, from the picket line such as "Ayuso, murderer, coward, you killed Aguilita, come on out, come out" and other phrases, which phrases were uttered in front of the entrance to the building. Besides the acts of violence he described, the officer testified that he had knowledge of the occurrence of other acts which he did not witness personally. The pickets were formed by employees of the petitioner and by persons who were not. Loudspeakers were frequently used and more so when there were employees inside the newspaper building. The pickets were maintained uninterruptedly during the 24 hours of the day and night. Upon being examined by counsel for the respondents, Captain Pérez testified:

"Q. Captain Pérez, isn't it a fact that during the strike when the violence was taking place on one occasion there were as many as 200 or more SIU pickets in the area where the violence was taking place? A. They were about the same as the Teamsters, if the Teamsters had people, one night I met about more or less more than 50 that came from Ponce. When I asked them from what place are you, they told me, I am from Ponce. Q. You know where the SIU pickets came from? A. From different places, from Santurce, there were Americans, there were two, three or more. ...Q. Regular seamen. During this period of time when there were 200 or 300 pickets of SIU present and a like number of the Teamsters, isn't it a fact that on some occasions there may be 100 or 200 policemen at that time? A. We never had 200 policemen."

The witness described up to a maximum of 63 policemen spread out in different parts of the area. Thereafter he stated that at present the people entered and left the building of "El Imparcial" without being stopped by anybody and that the newspaper was being published and also sold in the streets. He also stated, upon being examined by petitioner, that the assaults witnessed by him had been committed before the SIU pickets were established and that he never saw the members of this union attack the employees of the company. Recently there had been problems between the members of the SIU and the Teamsters and in his opinion the atmosphere

which prevailed in the vicinity of "El Imparcial" was not normal.

First Lieutenant Alejandro Oliveras, Commander of the District of San Juan, after making reference to several assaults and acts of violence on the part of the picketers against the employees of the company, and to provocations made from the picket line in front of the newspaper, calling its owner "a criminal, a bully" and other things of the sort, sometimes uttered through loudspeakers, stated that:

"Q. And tell me, Lieutenant, could you describe the atmosphere that has prevailed in the premises of El Imparcial by reason of that conduct on the part of the pickets, of violence and provocation? A. There has prevailed an atmosphere of very high tension due to the incidents which emerged so frequently. Q. How many policemen were there, more or less, or are there? ... A. There were times when there were forty or fifty men, other times there were more, because the place where the incidents were taking place was large. *Furthermore, the police was unable to prevent, within their limits, these incidents.* Q. And my question now is the following: notwithstanding the presence of the police at that place, how was it possible for those assaults and insults to take place? A. *The situation was so spread out that we could not humanly give the protection that the place and the persons there actually required.* Q. Is this the same situation that prevails at present? A. *Still.*"

The Lieutenant explained that these acts had occurred in front of "El Imparcial" very near its entrance, at Comercio Street, Fernández Juncos Avenue and Nolasco Rubio Street, that is, in the vicinity of the building facing four streets. The witness testified that certain incidents had occurred with regard to the free access to the building and he described the occasion when while accompanying two persons who wished to go into a collecting agency located in said building, respondent Humberto Trías shouted in front of the public, and repeated it several times, that he (the Lieutenant) was strikebreaker number one of "El Imparcial". Such incidents were repeated against several persons which were about to enter

the offices which had nothing to do with the newspaper. In the pickets whence the assaults and provocations arose there were employees of "El Imparcial", but in their majority they were members of the Teamsters Union. At the time when the hearing of the case was held, they were still maintained during the 24 hours of the day. He reaffirmed that he had no knowledge of any assaults made by the other union on the employees of the petitioner, "but rather the assaults have been on the part of the Teamsters against the employees of 'El Imparcial' and against the pickets of the Seafarers."

Upon being examined by respondents' counsel, Lieutenant Oliveras stated that they had attempted to reduce the pickets on both sides to ten only after the situation became too tense, that there were never 100 pickets from the SIU and what happened was that people had gathered around from one side and another; that there were times when more than 500 persons gathered behind the pickets maintained by the Teamsters near the entrance. At the other end of Fernández Juncos Avenue, beyond the territory of "El Imparcial" where the other union was picketing, there never was one-fourth or one-fifth of that number. After referring to some respondents as persons participating in the strike, the witness testified that these persons were mingled in an enormous crowd congregated there and that thereafter some measures had to be taken to clear the place. Three Molotov bombs were thrown against the police which exploded in the same place where the officers were trying to restore the order. It was impossible to determine who threw those bombs. Lieutenant Oliveras also described the state of provocations, threats and insults from the pickets against the newspaper and the persons who remained inside. The respondent Gil de Lamadrid, who had climbed on top of a bus, urged the public to take whatever action was necessary if they saw a strikebreaker entering the building, and that regarding the police, that they already knew what they had to do. Another

one urged the public to prevent by any method whatsoever the entrance of any person into the newspaper. The respondent Ojeda shouted through the loudspeakers that the police officers were receiving money from "El Imparcial", and he repeated this phrase in the presence of a judge, and in the presence of said judge he also declared that they had to win that strike at all costs *even if it causes bloodshed*. One of the pickets, a member of the Teamsters Union, named Angel Luis Vélez, offered $1,000 before a group of persons if they killed the witness, Lieutenant Oliveras. He stated that in his presence the respondent Trías Conde caused damages to the automobile of Director Mr. Ayuso, denting its top with a stone weighing about ten pounds.

Commander Benigno Soto, who is in charge of the police force of the metropolitan area, upon being examined by the petitioner's counsel stated that:·

"Q. Could you explain the atmosphere that prevailed or prevails there near El Imparcial? A. Well, the atmosphere . . . . was disturbed, it was not normal; the atmosphere is abnormal. Q. According to your own appreciation of the abnormal atmosphere about El Imparcial, do you believe, from your own experience, that El Imparcial can operate its business normally? A. No, sir, I do not think so. Q. You have already spoken of several assaults of which you have knowledge. My question is as follows: has there been police supervision in this whole labor movement in the vicinity of El Imparcial? A. Well, close to the premises, in the surroundings yes, but outside of that ambit, no. Very little. Q. How can you account for the personal assaults that took place in the surroundings of El Imparcial, notwithstanding this vigilance that you have kept? A. *Well, we can not spread out in such a manner as to give an adequate protection to the persons there. At times those assaults occur outside the ambit where we are working.* Q. That is, that at times they occur so suddenly that it is impossible for you to avoid them? A. They also occur suddenly, notwithstanding our presence there, *and we can not avoid them.* At times we have to wait till the incident takes place because we cannot interfere with the persons unless an offense has been

committed in our presence. . . . . . Q. Due to this state and atmosphere of violence that has prevailed in that place, is it not true, Commander, that free access has been obstructed there, not only to the plant of El Imparcial, but to the tenants of the building? A. Yes, sir. . . . . Q. Do you believe that the threats, the danger of an attempt against the property and against the persons employed in El Imparcial have ceased? A. *Right now it has not ceased."*

Upon being examined in English by respondents' counsel, Commander Soto testified:

"Q. At any time during the strike, have you ever stated to any of your superiors, or anyone else, that the police were not able to take care of the strike situation at El Imparcial? A. Well, we have reinforced the police down there *but we cannot control everything.* Q. But you can't? A. We cannot control everything. Q. Are you controlling the strike situation now? A. *Now it is under control.* Q. How long has the strike been under control? A. *I should say two or three days because of the fights between SIU members and Teamsters.* Q. And those are minor skirmishes in the strike? A. Very close to the building. Q. Have you, or any of your officers, refused at any time during the strike to give police protection to anybody wanting to leave or enter the building? A. That is our duty, to give protection to both parties. Q. My question is have you or any other officer at any time during the strike refused to give protection? A. No, we have to protect any person who asks us for protection. Q. Absolutely? A. That is our duty. Q. Your duty, and you have been ready and willing and able during the strike to give what protection is necessary, is that correct? A. *Well, some times, so many persons ask for protection that that protection is not enough.* Q. Give me an example of that. A. For example, we have received information that many of the employees of El Imparcial have been threatened in their homes and on their way to their homes, when coming out or entering to the Imparcial, *so we can not give enough protection to those people.* Q. Obviously you cannot send police to the homes of all the people involved. A. That is right. Q. At the present time the newspaper is operating, is it not? A. That is right. Q. And people are going in and out of the building? A. That is right. Q. And the newspaper is being printed?

A. That is right. Q. And trucks come, pick up the newspaper and take it away? A. That is right. Q. And there are no incidents, there have been no incidents at the picket line in the last, at least this week, is that correct? A. *In the picket line corner of Nolasco and Fernández Juncos Avenue there have occurred fights* between members of the SIU and members of the Teamsters. Q. Those are matters you have been able to control? A. Yes, we control the situation now."

Upon being examined by the Court, the Commander testified that usually there were about 93 to 100 policemen in San Juan and Puerta de Tierra including the staff of officers, and that actually there were around 150 more who were brought from different parts of the island. Upon being examined by petitioner's counsel:

"Q. Tell me, Commander, the truth is that all these assaults of which you have knowledge have occurred notwithstanding the presence of a great number of policemen there? A. They have occurred. Q. And which you are unable to prevent? A. *And which have not been prevented.* Q. Is that true? A. That is the true situation. Q. And that at present there are fights between the two unions in front of El Imparcial? A. *There are fights, every day there are fights.* Q. This atmosphere that prevailed before, is it the same one that prevails now? A. The atmosphere there is tense, I mean it is abnormal, it is not normal."

The employee Pedro J. Burgos testified that "El Imparcial" ceased its publication since May 30 because of the strike of a group of employees of the newspaper in concert with the Teamsters, and it resumed its publication with a reduced number of pages on June 13, 1960. He referred to the assaults and threats made to the employees who remained in their jobs, including the destruction of the food brought to them from outside, preventing many of the employees, by those threats, from going to work particularly the majority of the women; he referred to the interruption of the free entrance of the employees and clients of the petitioner to the building, and to the breaking of the screen which protected a

window in the building at the time when it was rumored that the pickets were going to enter the newspaper. He testified that the circulation of El Imparcial had diminished in more than 50 per cent, that it had had great reduction in ads and that its late publication had adversely affected its sale. The petitioner offered, but upon an indication from the Court it desisted from presenting, some specific evidence regarding the losses sustained, since it would be cumulative.

Obviously, the evidence in the record goes beyond establishing sporadic breaches of the peace arising during a labor dispute—usually conducted in a peaceful way—which the police could suffocate at once with its intervention or by the arrest of the transgressors, and which would be the product of some isolated behaviour or of a momentarily roused spirit. The indisputable facts are more serious than what the trial court deemed them to be. Considering these facts in their full significance, they show the existence of a persistent *state* of violence and coercion maintained relentlessly by the respondents or some of them as a calculated means to prevail over the labor dispute and to win the strike even with bloodshed.

The respondents or several of the respondents persisted in maintaining this unlawful state of violence by the repetition, sometimes by the same persons who had been previously arrested, of assaults, personal provocations and insults, as well as damages to the property, notwithstanding the continuous and close presence of a considerable number of policemen and officers, in open defiance of the police authority established there and in contempt of the respect due them, which was also the object of assaults (Molotov bombs were thrown against them), threats and provocations, including putting a price on the head of a police officer. Because of the existence of a labor dispute and of the lawful right to establish pickets and to announce it in the vicinity of petitioner's company in order to win followers, the police by

itself could not prohibit or prevent in advance, as a precautionary measure, the presence there of respondents transgressors of the law, nor of any other person interested in the dispute. According to the testimony of Lieutenant Oliveras, it was impossible for the police *to prevent* these incidents, in a situation which had become abnormal and tense. It was unable to prevent them. As Commander Soto stated, they had to wait until the incident occurred because they could not intervene with the persons unless they had committed an offense.

In the circumstances which appear from the evidence, such *state* of violence thus maintained by the respondents or by several of them could not be overcome nor dissolved with the subsequent arrest and prosecution of the transgressors. In this sense, the protection afforded by the police is not adequate. As it may be seen, the picket itself constitutes the sensitive border line from which may sprout either the lawful and peaceful activity or the danger derived from any unlawful act. Notwithstanding the willingness at all times to fulfill their duties, as shown in the record, the evidence satisfactorily established that these officers charged with the duty to protect the property of the petitioner were unable to furnish an *adequate* protection. The police officers themselves indicated several situations of fact in which, in their judgment, it was impossible for them to furnish the adequate or necessary protection against the occurrence of incidents and provocative acts. Upon being asked whether according to his own appreciation of the *abnormal atmosphere* which existed in the vicinity of "El Imparcial" and from his own police experience, the company could operate its business normally, we have already seen that Commander Soto stated without any hesitation whatever that he thought it could not.[5]

---

[5] The term *property* as used in paragraph (e) of § 5, similar to § 7(e) of the Norris-La Guardia Act, and as it was used for similar purposes in the Clayton Act, 29 U.S.C.A. § 52, is not limited to corporeal property.

At the time when the hearing for the preliminary injunction was being held, the atmosphere of violence still prevailed, according to the testimony of the officers themselves, although during the last days the strike was under control, ironically, due to the fights between the members of the SIU and the Teamsters. The trial court concluded, in effect, that the acts of violence which occurred lately had not been against the petitioner but between the members of the Teamsters Union and the other union which intervened, but this fact did not alter the present situation nor did it fail to equally affect the petitioner, since the violence between the unions occurred within the same labor dispute to which it was a party and in the same place wherein said dispute was taking place.

▋▋ Ordinarily, it is not the function of the courts to prohibit criminal acts in order to prevent their commission. Generally this function rests with the executive spheres charged with the duty to maintain public order. However, when in the protected and privileged field of activity of a labor dispute the presence and intervention of the officers charged with the duty to maintain the public peace is unable to prevent the breach of the peace and that acts of force be repeated to the extent that an atmosphere of violence and intimidation persists, judicial intervention of a preventive type is permitted and sanctioned by the very same Act that protects this privileged field of action in order to insure that the labor dispute be conducted in a peaceful and orderly way such as is desirable in this type of controversy, with the full

It includes the use thereof as well as the business or enterprise carried on by an individual. *Cf. Knapp-Monarch Co.* v. *Anderson,* 7 F. Supp 332, 335–336; *Tri-Plex Shoe Co.* v. *Cantor,* 25 F. Supp. 996, 998. And see: *Truax* v. *Corrigan, supra; Duplex Co.* v. *Deering,* 254 U.S. 443, 465; *American Steel Foundries* v. *Tri-City Council,* 257 U.S. 184, 202; Annotations and cases cited therein in 27 A.L.R. 418, 97 A.L.R. 1346 and 106 A.L.R. 370. Ludwig Teller, *Labor Dispute and Collective Bargaining,* 620 *et seq.,* Vol. 1. That the act did not establish any distinction between physical and intangible property was crearly expressed by Mr. LaGuardia. Debates, Congressional Record, Vol. 75, p. 5480.

guarantee and protection of the interests in conflict. With regard to the requisite fixed in paragraph (e) of § 5 of Act No. 50, and in view of the facts appearing from the record, the preliminary injunction should not have been denied.

This conclusion is not in conflict with the authorities relied upon by the trial court, *Donnelly Garment Co.* v. *Dubinsky*, 154 F. 2d 38 (C.A. 8); *Carter* v. *Herrin Motor Freight Lines*, 131 F. 2d 557 (C.A. 5); and *Wilson & Co.* v. *Birl*, 105 F. 2d 948 (C.A. 3), which were the only decisions cited by the respondents in the brief two-page argument filed in this Court. The *Dubinsky* case, amply cited, involved an action for an injunction prosecuted in 1942 (55 Fed. Supp. 587, 589) wherein the defendants were charged with having entered into a conspiracy among themselves and with other persons to compel the plaintiff Donnelly Garment, by violence, fraud and by threats of such unlawful acts, to recognize another union of which its employees were not members as the sole bargaining unit, and to compel the employees of the Company to become members of said union. It was alleged that the public officers charged with the duty to protect the plaintiff against the unlawful acts which had been threatened were unable or unwilling to furnish an adequate protection. In the first place, the Court of Appeals included in the record that the district judge had concluded that said conspiracy or unlawful threat had not existed as a question of fact. But assuming that this was not so, the Court of Appeals was of the opinion that the plaintiff had failed to make the proof required by § 7(e) of the Norris-La Guardia Act (§ 5(e) Act No. 50). The district judge concluded that it had not been established that the police of Kansas City was either unable or unwilling to furnish adequate protection against any violence which "might occur" on the picket line or elsewhere, "if and when a strike occurs" at Donnelly, or otherwise, to protect plaintiff's employees who may not be in sympathy with any strike called by the union and he added that the

experience in strikes in other cities and the fact that some or all of the strikers may be women does not justify a finding that the police force of the city is unable or unwilling to furnish protection against any violence which might occur. The Court of Appeals agreed that no other finding could have been made on the evidence in this record. It pointed out that no strike had ever been called against the plaintiff nor any acts of violence committed against it and that in the strikes of 1937 which were attended by violence by the union, it had been decided, when the injunction was granted, that the police was able but unwilling to prevent the violence which occurred there and that since then changes in the local government and a complete reorganization of the police force had taken place. Finally, the Court of Appeals brought attention to the fact that the plaintiffs failed to call the police officers to the witness stand in support of the allegation that they were either unable or unwilling to give plaintiffs adequate protection against any acts of violence reasonably to be anticipated, thus depriving the trial court of the opportunity to ascertain, from the testimony of these officers, their willingness to discharge their duties. The Court of Appeals concluded that the record was barren of any evidence upon which the trial court could have made the finding requisite to jurisdiction and from the absence of said testimony it inferred the fact that had the testimony of said officer been offered, it would have been against the plantiffs. Obviously, the facts of this case are not similar to the situation of the case at bar. In the *Carter* case the question turned mainly on the requisite of negotiation and voluntary abitration of the dispute contained in § 8 of the Norris-La Guardia Act (§ 6 of Act No. 50). The Court of Appeals reversed the decree of injunction which had been granted and it concluded that it ought not to have issued by reason of the failure to comply with such requisite. Thereafter, it held that the plaintiff had also failed to establish that the local authorities could not or would not

furnish adequate protection. To this end it summarized the testimony of a police officer in the sense that the latter was able to furnish and did furnish protection to the plaintiff and that he could maintain and did maintain the peace in front of plaintiff's business. The court found that this evidence negatived the allegation and finding that the local authorities either could not or would not give protection. In the *Birl* case, which involved a labor dispute to obtain a closed shop, it was stated that there had been little violence in general, and no evidence that the three or four instances of violence had been ratified, and that the picketing of plaintiff's plant was being carried on under police supervision and control, and the police appeared to have supplied protection against injury to physical property. In *Green* v. *Obergfell*, 121 F. 2d 46 (C.A.D.C.), *cert. denied*, 314 U.S. 637, wherein the question of police protection was also raised, the Court of Appeals, in reversing the decree of injunction granted, points out that the evidence failed to show said lack of protection, or that the unlawful acts were not actually abated and the offenders punished long before the trial of the case; that in fact, the record showed that the police officer testified concerning events which occurred in 1935, the original complaint was filed in 1937 and the hearing was held in 1939.

In the interpretation of the federal legislation and of the state laws which to a greater or lesser extent have banished the injunction from the labor-management field, violence in itself during a labor dispute and the unlawful or abusive methods of coercion have never been considered as being beyond the reach of this traditional equitable relief which protects a party particularly affected by criminal acts against irreparable injury, notwithstanding the penalties provided by the penal statutes for such acts. The courts have never disagreed in this respect. Thus, under its own terms, the Clayton Act of 1914 allowed the issuance of an injunction only when it was necessary to prevent irreparable injury to

the property or to property rights, when there was no adequate remedy at law, it being ordinarily considered by the courts that in situations involving labor disputes the violence or the unlawful or abusive methods of coercion produced such state of damage. Such has been the case under the Norris Act of 1932, which expressly excludes unlawful acts or fraud from the activities which were immune to the granting of an injunction.

However, pursuant to the Norris-La Guardia Act and to the adoption which we made thereof by Act No. 50 of 1947, violence or unlawful acts of coercion are not sufficient for injunctive relief to prevent irreparable injury, as was the case under the law, prior to the adoption of said statute, and still is in some state jurisdictions where, upon adopting a similar legislation, the requisite fixed by § 7(e) [§ 5(e)] was not included. It is necessary to determine that the public officers charged with the duty to protect the property of the party requesting the remedy are unable or unwilling to furnish adequate protection. [6] On the other hand, it is not sufficient for the police force to furnish protection; it must

---

[6] This provision and § 8 which imposes the previous obligation to negotiate the dispute have been considered as the more drastic and innovating additions introduced into the legislation against the labor injunction. Referring to § 7(e), Representative O'Connor stated that the (federal) court should certainly not exercise any police power if the constituted authorities were willing and able to perform that function. It has been held that the officers referred to by said provision are the local police authorities of the city, county or state where the dispute occurs. Representative Beck, referring to said provision, remarked that such an inquiry would be an affront to the authorities of a state. Congressional Record, Vol. 75, pp. 5464, 5472. Although § 7(e), together with the other provisions of the Norris Act, answers to a congressional attitude meant to limit in a drastic way the jurisdiction of the federal courts to grant injunctions in those cases, it covers, in passing, the eternally touchy problem of the proper relationship between the federal and state sovereignty, thus avoiding to the extreme the federal intervention in functions which primarily belong to the state, such as the establishing and preservation of the public peace. As we indicated above, not all the states which enacted a legislation substantially following the Norris Act adopted § 7(e), and with the exception of the New York cases said provision scarcely appears as having been discerned in the state decisions.

be an *adequate* protection. The term "adequate" which here has a dual import of fact and law, is not a mere characterization of more or less content. In harmony with the judicial precedents already known, it had to be used by Congress within the scope of the constitutional guarantee of the due process of law. According to the principle laid down in *Truax* v. *Corrigan* and in other cases alluded to in the congressional debates of the Norris Act, the denial of an injunction in a labor dispute in which one of the parties sustains irreparable injury in circumstances where the protection offered by the police against acts of fraud or violence is not effective, would ultimately lead to a deprivation of the property without the due process of law. Hence, the fundamental meaning of the characterization of *adequate* of the police protection.

■■ In the light of this concept of evaluation regarding the scope of the constitutional guarantees, it is not always possible to decide the problem in terms of a quantitative formula of the protection offered. It is necessary to make a reasonably balanced evaluation of each situation in the light of the facts and circumstances of each particular case and of the values involved therein. A large police force may not give an adequate protection in the presence of certain factors. Together with ostensible facts underlying the conduct of certain persons or group of persons, there coexist at times certain harmful subjective elements or designs and purposes, the pursuit of which the police, no matter its force, is not always able to prevent. Such is the peculiarity and at the same time the difficulty presented by the picket that is not conducted in an orderly way and in which there might coexist, without a definite demarcation, the inviolate expression of freedom of speech or the exercise of a lawful labor-management right with acts of fraud and violence. Under these circumstances, when violence thunders out, there overhangs the danger that an effective protection to actually restrain

the unlawful acts might operate equally as the suppression of the lawful rights of expression. In fact, there have been precedents. *Cf. Drivers' Union* v. *Meadowmoor Co.,* 312 U.S. 287, 294 and Annotation 132 A.L.R. 1218. It is always preferable that the peaceful activities be not suppressed if the unlawful act may be prevented.

Whether an adequate police protection is furnished or not presents ultimately a question of law, insofar as this prevents or permits, in law, the granting of an injunction.[7] In deciding this question, we are at liberty to make our own estimation of the indisputable facts in the record, and according to them we conclude, as a question of law, that the protection furnished by the police was not adequate. The petitioner

---

[7] Seldom, as far as we have been able to find, has an attempt been made to define a priori the legal import of paragraph (e) of § 5 (§ 7(e) Norris Act). One of these few expressions appears in *Cupples Co.* v. *American Federation of Labor,* 20 F. Supp. 894 (D.C. Mo.) followed with approval in *General Electric Co.* v. *Gojack,* 68 F. Supp. 686 (D.C. Ind.), cited by the petitioner in its brief. In the *Cupples* case, where the injunction was denied on the basis of the evidence, it was stated that: "What alleged facts or what proof would be sufficient to establish the fact that local officials are unable or unwilling to furnish adequate protection? Of course, if there should be a definite declaration on the part of those officials of unwillingness to act that would be sufficient in that respect. Likewise, if after active co-operation by local officials, bloodshed or violence resulted in spite of that co-operation and assistance, the proof of such facts would be sufficient. But certainly Congress did not intend that this court should await the declaration on the part of local officers of their unwilllingness to perform their duty. Most certainly it did not intend that this court should stand by until actual bloodshed, strife, and violence occur before it should lend its aid to then merely prevent a repetition of what Congress evidently intended should be prevented in the first instance." In *Carter Const. Co.* v. *Nischwitz,* 111 F.2d 971 (C.A. 7), it was stated that the protection contemplated by the statute was that which, in the light of the facts involved therein, would have enabled the plaintiffs to proceed with work on the projects. See comments by Frankfurter and Greene on § 7(e) of the then Norris Bill in the Labor Injunction, pp. 221–222 and Appendix IX, p. 279.

In Rothenberg on Labor Relations, pp. 208–209, it is commented, and it is so in effect, that the reported cases display no special agreement on what constitutes the required quantum of proof under this subdivision or to what degree there must be a failure of protection. The situation seems to be decided in the light of the facts and circumstances present in each particular case.

has a right to be protected against all conduct on the part of the respondents which, even within the abnormality created by a strike movement, prevents it from operating its business· normally, free from personal assaults, threats or intimidation made upon its employees not participating in the strike who· wished to work but refrained from doing so on account of said assaults and threats; free from injury to its physical property and from obstacles to the free access to its premises; free from intimidation and insults and from the state of violence created in this labor dispute. [8]

 Since the police protection furnished was not adequate in this case, it is appropriate to issue the preliminary injunction if the other requisites provided by § 5 are ·present. The indisputable facts in the record, considered in the light of the doctrine applicable to this case permit us to conclude in addition: (a) that acts of violence have been committed which had not yet ceased at the time when the hearing was being held before the trial court and that in the absence of any indication to the contrary, they will continue to be committed unless restrained, *cf. Tri-Plex Shoe Co.* v. *Cantor*, 25 F. supp. 996; *Local 167* v. *United States*, 291 U.S. 293, 297, 298; *Levy and Devaney, Inc.* v. *International Pocketbook Workers, etc.*, 159 Atl. 795, 796; (b) that substantial and irreparable injury to petitioner's physical property [9] will re-

---

[8] *Cf.: Youngdahl* v. *Rainfair Inc.*, 355 U.S. 131; *Hotel Employees* v. *Sax Enterprises*, 358 U.S. 270; *United Automobile Aircraft, etc. Workers of America* v. *Wisconsin Board*, 351 U.S. 266; *Building Service Union* v. *Gazzam*, 339 U.S. 532; *International Union, etc.* v. *Wisconsin Board*, 336 U.S. 245; *Allen Bradley Local* v. *Board*, 315 U.S. 740; *Hotel Employees Local* v. *Board*, 315 U.S. 437; *Drivers' Union* v. *Meadowmoor Co., supra,* but compare, in part, with *Youngdahl* v. *Rainfair, supra; Local No. 332, etc.* v. *Grand Trunk Western Railroad Co.*, 239 F.2d 851 (C.A. 6); *Southern Lines* v. *Amalgamated Ass'n, etc.*, 38 So.2d 765; *United States Pipe Foundry Co.* v. *United Steelworkers, etc.*, 157 A.2d 542; *Busch Jewelry Co.* v. *United Retail Employees Union, etc.*, 22 N.E.2d 320, 124 A.L.R. 744; *Steiner* v. *Long Beach Local No. 128, etc.*, 123 P.2d 20.

[9] The Norris Act uses the term "property" only. Besides the fact that there is nothing in the legislative history of Act No. 50 which indicates a legislative intent in this sense different from the one contained

sult; (c) that greater injury will be inflicted upon the petitioner by the denial of the preliminary injunction than will be inflicted upon the respondents by the granting thereof. In effect, the respondents cannot invoke a balance of convenience in their favor which would permit them to commit acts in violation of the law; (d) that petitioner has no other adequate remedy at law. The arrest and eventual criminal prosecution of the offenders does not furnish, in the circumstances of this case, such remedy.

In view of the foregoing, the order appealed from is reversed and the case is remanded to the trial court, with instructions, according to the former conclusions: (a) to issue the preliminary injunction against the respondents or against such respondents as may be appropriate pursuant to the evidence in the record, in such terms as are just and adequate to guarantee the rights of the parties in this labor dispute in the light of all the circumstances involved therein, and pursuant to the provisions of §§ 2, 4, 5(a) and 7 of Act No. 50; and (b) to continue the proceedings regarding the permanent injunction.

---

MR. JUSTICE SERRANO GEYLS with whom MR. JUSTICE PÉREZ PIMENTEL and MR. JUSTICE BLANCO LUGO concur, dissenting.

With due respect to the Court I must dissent from the opinion of the majority. I believe that the findings of fact of the trial judge are amply supported by the evidence and that as a matter of fact as well as of law, the Police furnished to petitioner "the adequate protection" mentioned in Act No. 50 of August 4, 1947 (Sess. Laws, p. 276; 29 L.P.R.A. §§ 101–109). I likewise disagree with several interpretations of a legal and constitutional order which are stated in

---

in the Norris Act, according to well-grounded principles, the term "physical property" includes, for the purposes of this statute, the business or concern of an individual.

the opinion,[1] but unfortunately the time limitation prevents me from making an analysis of that aspect. Therefore, I shall limit my arguments to the first question.

Before delving into this discussion, it is necessary to frame the controversy, even if summarily, within its adequate historicolegal background. It is well-known that union activities in the United States met at their inception with enormous handicaps. This painful story has been admirably narrated in several books and this is not the place to repeat it. It suffices to say that in the legal field the unions had to meet tests derived from penal, anti-trust and tort doctrines, which were used with remarkable efficiency to unduly restrict their activities. From the latter stemmed the judicial practice of characterizing the "legality" of the union activities in terms of their objectives and their means. The injunction became the favorite procedural instrument to destroy or weaken the unions, while the judges kept the absolute power to grant or deny it depending upon their own view of the desirability of the labor activity. It goes without saying that that view, except in very few occasions, was always hostile to the workmen.

This abuse of the "objectives" test, together with several unfair procedural practices,[2] prompted the workmen to protest bitterly before Congress and to seek remedies which would restrict the jurisdiction of the federal courts, the main

---

[1] I must indicate, however, that the assertion which brands as unconstitutional an act which prohibits the granting of injunctions in labor disputes when the police protection is not adequate seems to me of a doubtful validity and particularly absolutely unnecessary. That problem is not before this Court in the present case and to anticipate a judgment on such a delicate matter is, in my opinion, to depart from the fundamental standard, flowing from the doctrine of separation of powers, which prohibits a court from anticipating a question of constitutional law before being in the necessity of deciding it. *Ashwander* v. *Tennessee*, 297 U.S. 288, 346 (1936); *Commonwealth* v. *Aguayo*, 80 P.R.R. 534, 577, 582 (1958).

[2] The history of these judicial actions has been impressively related in the classical work of Félix Frankfurter and Nathan Green, The Labor Injunction (1930), which also contains an elaborate discussion of the

guilty parties for such practices, to issue writs of injunction. That clamor culminated with the passage in 1914 of the Clayton Act, which so proudly proclaimed that "the labor of a human being is not a commodity or article of commerce," it enumerated the basic rights of the workmen and prohibited the federal courts from granting injunctions in labor disputes except to prevent irreparable injury to property. But the "Magna Carta of industrial freedom" as it was jubilantly labeled by Samuel Gompers, did not produce the expected results. Soon the Federal Supreme Court reduced the Clayton Act to ruins by applying extremely strict interpretation.[3] With these interpretations in mind the federal courts continued issuing injunctions against union activities based on the predilections of judges as to the social and economic convenience of that conduct. The procedural practices suffered no significant change either.

To confront those problems Congress passed the Norris-La Guardia Act in 1932.[4] This Act "can be viewed as a three-pronged attack on judge-made labor law and its administration. First, the Act rejected the injunction as a remedy in labor disputes. Second, it declared that federal courts were not the proper agency of the government to formulate substantive labor policy. Third, it repudiated the federal common law of labor relations and established a policy of governmental neutrality in labor disputes as a means of

Senate bill which finally became the Norris-La Guardia Act (pp. 205–228). Explanatory notes on the abuses of proceeding are found in Handler, Cases and Materials on Labor Law 141–144 (1944); *Truax* v. *Corrigan,* 257 U.S. 312 (1921), dissenting opinion of Mr. Justice Brandeis; *Great Northern R. Co.* v. *Brosseau,* 286 Fed. 414 (N.D. 1923).

[3] See *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U.S. 229 (1917); *Duplex Printing Press Co.* v. *Deering,* 254 U.S. 443 (1921); *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U.S. 184 (1921).

[4] "The legislative history of the Act demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act respecting the exercise of jurisdiction by federal courts and to obviate the results of the judicial construction of that Act." *New Negro Alliance* v. *Sanitary Grocery Co.,* 303 U.S. 552, 562 (1938); *Order of Railroad Telegraphers* v. *Chicago & N.W.R. Co.,* 362 U.S. 330, 336 (1960).

aiding the growth of organized labor." Winter, *Labor Injunctions and Judge-Made Labor Law: The Contemporary Role of Norris-La Guardia*, 70 Yale L.J. 70, 73 (1960). Those objectives and the Act that embodies them have today full force except as to certain modifications expressly made in subsequent federal acts. *Order of Railroad Telegraphers* v. *Chicago & North Western Railway Co.*, *supra* at 335; *Marine Cooks & Stewards, A.F.L.* v. *Panama Steamship Co., Ltd.*, 362 U.S. 365, 369 (1960); *Accommodation of the Norris-La Guardia Act to other Federal Statutes*, 72 Harv. L. Rev. 354 (1958); Winter, *op. cit. supra* at 76–102.

The enumeration of the rights of the workmen and the procedural innovations contained in the Act are stated in the opinion of the Court in this case and need not be repeated here. It is fair to state, however, that those rights and those innovations received and continue to receive on the part of the Supreme Court and the other federal courts a strict interpretation in compliance with the legislative intent and that in that way those courts were prevented from unduly interfering in a number of labor disputes. *Marine Cooks & Stewards, A.F.L.* v. *Panama Steamship Co., Ltd., supra* at 369.

In 1947 the Legislative Assembly of Puerto Rico approved an Act which is practically a copy of the Norris-La Guardia Act. 17 *Rev. Jur. U.P.R.* 272 (1948). The Act does not contain a statement of the motives which prompted the lawmaker to pass it, but the verbatim use of the wording of the Norris-La Guardia Act is conclusive proof that the aim pursued was identical. Furthermore, in the few instances where our Act makes changes, the evident purpose is to make still clearer the restrictive public policy of the injunction in labor disputes.[5] It is not significant, therefore,

---

[5] See, for example: (a) the inclusion of the word "*todas*" * in the last line of the first paragraph of § 5 (29 L.P.R.A. § 105, 29 U.S.C.A. § 107) to avoid the interpretation that it is sufficient to meet only some of the requirements enumerated therein; (b) in the same subdivision (a)

even if it were correct, that the historical circumstances of the Puerto Rico of 1947 were any different from those of the United States of 1932. In passing the anti-injunction Act of 1947, the Labor Relations Act of 1945 and 1946 (29 L.P.R.A. §§ 61–76), and the other Acts tending to protect the rights of the workmen, our Legislative Assembly evidenced a commendable anticipation of future conflicts and manifested the purpose that the ambitious program of industrialization which was starting during the same years was not going to be tainted by the abusive practices against the individual worker and the unions which had characterized American industrialization at the end of the nineteenth and at the beginning of the twentieth century.

Having lain the historicolegal groundwork, let us now turn to the facts. It is necessary to bear in mind that in this kind of controversies we must look exclusively for specific acts of "fraud and violence" committed by respondents. It is only against these acts that the statute authorizes the restraining orders. This notwithstanding, the opinion of the Court combines in the same recital of facts: 1. acts which are perfectly legal and are protected by the Constitution with acts of "fraud and violence"; 2. acts committed by the respondents with acts committed by other persons and even by unknown persons; 3. acts committed against the petitioner with acts committed against other persons; and 4. conclusions and general statements of the witnesses on the evidence with testimony on specific acts. That exposition helps very little to fix responsibilities and becomes very dangerous in a suit which may lead to summary proceedings of contempt, and in a sphere of action full of passionate

---

of the same section the use of the words "acts of fraud and violence" instead of "unlawful acts" to make the restriction clearer; (c) the addition of the word "physical" to the term "property" in the same section, to avoid the inclusion of normal damages caused in strikes and pickets.

intensities and intervened by numerous statutory and constitutional provisions, federal as well as state.

Let us first take the dates. The evidence shows that the strike began on May 24, 1960, the complaint was filed on June 9, the hearings were held on June 15 and 16, the judgment was rendered on the following day, and the appeal was taken on June 28.

The petitioner enumerated in its allegations fourteen specific acts of violence committed by several respondents. Two of them occurred on May 25, two on the 26th, two on the 27th, three on the 29th, one on the 30th, one on the 31st, one on June 3, one on June 4, and one on the 6th. It further included several general allegations of violence insults, threats and intimidation.

Four persons testified at the hearing: three police officers and one employee of the petitioner.

The Captain of the Police, Luis M. Pérez, was at the scene of the events since May 26. He had a shift of eight hours daily but at times he stayed from twelve to sixteen hours.[6] On May 26 he found only one picket, consisting of from ten to twelve persons situated several feet from the main entrance; then at other times there was another picket in the other street, consisting of the same number. He identified Gil, Cruz, Ojeda, Trías, Amador, Virella, Montoya, Arguinsoni, Oliveras, Cruz Roque, Feliciano, Rodríguez Benítez, Percy, and Chávez, as the persons whom he saw at the picket lines. The conduct of the pickets was this: "There were times of inactiveness, but there were times of tenseness and times when we had to impose order, call their attention on such occasions as when going to and coming from work, especially at noon, and when leaving in the afternoon, specifically." As to night pickets: . . . there were certain days when there was no picket, one or two persons, or someone

---

[6] Initially his shift began at six a.m., then (we do not know exactly when) it began at four a.m.

sitting on chairs resting, I mean late at dawn when I arrived, but at other times the picket was already formed there."

Since May 26 until the day of his testimony—June 15—and during the whole time that he was there, Captain Pérez only witnessed three acts of assault and one of insults, all of them having taken place "at the beginning": 1. On May 26, between eleven and twelve o'clock in the morning, Humberto Trías grabbed Ismael Hernández, petitioner's employee, by the feet, he fell, got up and ran, and then Cruz Roque "jumped on him"; Pérez separated them and proceeded to arrest him. Hernández received slight bruises; 2. One day ("I do not recall the date") Humberto Trías, in front of the main entrance, "thrusted a kick" at Joaquín Martínez Rousset, another employee of petitioner, after trying to speak to him and the latter having refused, and hit him slightly; 3. José Gil de Lamadrid attacked (it does not say on what day) Luis Cortright, another employee of petitioner, with his fists and caused him "a small scratch" on the cheek; Pérez intervened but Cortright refused to prosecute the attacker; 4. A "university young man" named Jim Landrot "one evening" and from the picket line uttered the following words: "Ayuso, murderer, coward, you killed Aguilita," "Come on out, come out." He has no knowledge of any attempt or destruction of the property. As to the police vigilance, Pérez explained that the police was posted at the different places near the building and that they had at one time 108 officers, "at least." Since "last Monday" S.I.U. pickets had commenced, first consisting of ten persons and at one time it had fifty, but always in the same number as the Teamsters. What was the situation when Captain Pérez testified? There were "two different pickets, one in Nolasco Rubio and another at San Juan Pier 3, Fernández Juncos, and in Nolasco there are four on one side and four on the other. When I left it on the other side there were three and

three, I do not know right now." For those pickets which had a total number of fourteen persons, there were 52 policemen assigned. The people go in and come out of the building of El Imparcial without any one stopping them; the newspaper is being published; the trucks reach the building and go out with the newspaper; the police gives protection to the vehicles distributing the paper and at times they escort some of the employees "when necessary." He believes that the prevailing atmosphere nearby the building "is not normal."

*Alejandro Oliveras*

He is a Lieutenant of the Commonwealth Police and was at the scene of the events at least since May 26. He specifically describes the following acts of violence: 1. On "one of the days of the month of May" he arrested Gil de Lamadrid because he had attacked with his fists a newspaper employee, "a certain Castillo"; 2. simultaneously Trías attacked another employee whose name he does not remember; 3. Trías kicked a photographer, named Sostre, and he hit the camera with the shoe; 4. Trías threw a stone of about ten pounds on the automobile of Ayuso and dented its top. Insults: Trías called Ayuso and other employees "strikebreakers, murderers, and other things of the sort"; 2. Ramón Díaz Cruz "uttered insults." Actions against the police: 1. When Oliveras was escorting two persons to the building, Trías shouted that he (Oliveras) was "strikebreaker No. 1 of El Imparcial"; 2. Trías shouted "strikebreakers" to the police and accused the officers of "taking money from El Imparcial"; 3. Angel Luis Vélez "offered $1,000 to any one who killed me"—he does not remember the day nor the hour, the phrase was heard "by a policeman," he remembers "the person who witnessed it" but not the persons who were present; 4. "one day" three Molotov bombs were thrown from the public to the police without it being determined who threw them. He further testifies of exhortations made

by Trías and Lamadrid to the public to take the "necessary action" against the strikebreakers and the police. He identified Chávez, Trías, Gil de Lamadrid, Ojeda, Lander, Díaz Cruz, Vélez, and Amador, as the persons whom he saw in the pickets. He adds that there were 40 to 50 policemen, "other times more." The public assembled and "there were times that there were more than 500 persons behind the picket lines of the Teamsters," and at the other end "one-fourth or one-fifth," but from the mass of the public he could not identify who were seamen and who were Teamsters. The police took the following action (it does not say when exactly) : 1. it separated the relays from the pickets; 2. it established a distance of from 35 to 40 feet between the pickets of both unions; 3. it limited the pickets to ten on one side and ten on the other; 4. it dispersed the public from the place (this happened because of the Molotov bombs that were thrown at the police from the public).

As to the general situation he describes it "so spread out that we could not humanly give the protection that the place and the persons there actually required," and adds that that is the situation "still" prevailing. However, this last conclusion of witness Oliveras is wholly destroyed by the fact that he testified that because "he is a sick man," he had been at least five days [7] without going to the place of the events. That circumstance further shows that the specific acts of violence described by him had also taken place on a date prior to those five days.

*Benigno Soto*

He is a Commander of the Commonwealth Police. He began to participate in the strike since May 24. He knows

---

[7] Testifying on Thursday, June 16, Oliveras said that "since last Saturday I am not in the picket line, because, I must explain, because although I am commander of the district of San Juan, my physical condition does not permit me to continue working in that place, because I have been a sick man for some time and my physical condition does not permit me to take the burden of that work which is enormous."

of the events from information "very little of my own knowledge . . . the information was given to me by the police and Captain Luis M. Pérez." He does not mention a single specific case of violence. He says the Teamsters began "to picket" on May 24 and the S.I.U. on June 6 or 7. He heard no insults at the place. There are three shifts of fifty policemen each. Both unions were ordered to reduce the pickets to ten persons each. The public was blocked off fifty yards from the place. The newspaper is operating, the people go in and come out, the trucks take the newspaper and carry them away. There have been no incidents in the last week except fights in the corner of Nolasco and Fernández Juncos between members of both unions but that situation is controlled by the police. He considers that the atmosphere "is disturbed," that it is not "normal," that there is "tension," but that the police "controls the situation."

*Pedro J. Burgos*

He is a reporter of El Imparcial. He specifically mentions only one incident of violence: on Saturday, June 4, from nine to ten o'clock in the evening, one of the pickets broke the screen that covers one of the windows in the main floor with a club. He adds also that "an attorney" who was going there with an edict was "intercepted." He does not specifically mention any other incident. As to the prevailing situation all he says is that "there are still employees who are afraid to enter the plant freely" and that the "police protects the ingress and egress of the employees at the entrance of the newspaper." He testifies that the newspaper ceased to be published on May 30, "because of a strike of a group of employees of the newspaper El Imparcial in concert with the Teamsters," and that it resumed its publication on Monday, June 13. The number of pages and of advertisements as well as the circulation of the newspaper has decreased.

That is, in synthesis, the specific evidence introduced. In addition, the witnesses referred to other "incidents," "threats," "insults," and "provocations" of which it is alleged they had knowledge but without any of them indicating the least circumstance that would permit them to identify them and much less weigh them. It is evident that this type of evidence has no force in suits of this kind. The repeated reference of the Act to "acts of fraud and violence" and to "specific acts" [8] shows that it precisely sought to prevent the granting of injunctions on the basis of allegations and proof of a general character. That had been one of the worst practices of the federal courts against which there was intense protest. Frankfurter and Greene, *op. cit. supra* at pp. 60–81. The following words written by the Supreme Court of Wisconsin more than half a century ago, in connection with petitions for injunction in labor disputes are, undoubtedly, more pertinent as to the evidence:

"A complaint in an action for an injunction by the employer in such case should be detailed, certain, and specific, giving facts and circumstances including time and place of each alleged act of coercion, the name of the person coerced, if known, the manner in which he was coerced, and the manner in which and the extent to which it affected or impeded the employer's right to conduct his business in a lawful way." *Badger Brass Mfg. Co.* v. *Daly*, 119 N.W. 328, 330 (1909).

The way the witnesses characterized the situation is also of little help in this suit. It is true that their opinions, particularly those of the public officers, are useful in weighing the situation adequately. But in this suit the branding of the atmosphere as not "normal" is rather indefinite and the specific findings made strip them of all their authority. After all, a judicial order can not be based on an adjective.

In short, the specific evidence shows that during the first days of the strike there were several acts of violence, committed by the persons we have already mentioned. All the

---

[8] Sections 4, 5 and 7.

cases involve slight assaults or damages of little importance against the property. Together with these acts, insulting phrases were uttered and on two occasions the public was urged to act against the strikebreakers and the police. The aforesaid acts were committed more frequently in the last days of May and the first days of June. However, as soon as the police took the obviously necessary measures in the situation (and which I am convinced should have been taken earlier) the acts of violence ceased. It is very significant in this respect that the fourteen specific acts of violence mentioned by the petitioner in its complaint (of these it could only prove six and under circumstances different from those alleged) took place, according to its allegation, between May 26 and June 6, and ten of them took place on May 25 and May 31. There is no allegation whatsoever that specific acts of violence were committed after June 6, and there is no evidence whatever of any of these acts after June 4.

Therefore, at the time the complaint was filed, June 9, at the time of the hearing, June 15 and 16, and for several days, the situation was the following: the pickets were limited to ten persons for each union and they frequently consisted of three or four persons; the two groups were separated by a distance of 35 to 40 feet; the relays were kept apart from the pickets; the public had been dispersed; the persons entered and left the building without being molested; the newspaper was being published and the trucks entered and left freely to pick them up and distribute them; the police kept three shifts of 50 officers each, to watch the pickets and the surroundings of the building and it further offered special protection to all the vehicles of the petitioner and to any employee who requested it; at least since June 4 the attacks against the employees of the newspaper had ceased as well as the attacks against the property and there only remained some skirmishes between the members of both unions (as to the specific circumstances of these skirmishes

there is nothing in the evidence, but we do know that the police stated that "it controlled them") ; every person who had committed acts of violence had been immediately arrested and the cases had been submitted to the competent authorities.

Where is, therefore, the "persistent state of violence and coercion" maintained by the respondents? The facts indubitably show that it did not exist at the time that the injunction was sought nor at the time judgment was rendered, and that the police was giving petitioner, its property, and its employees and visitors a fully adequate protection.

The jurisdictional requirement of the Norris-La Guardia Act and of our Act of 1947, which prohibits a court from granting an injunction in a labor dispute unless it is proved "that the public officers charged with the duty to protect the property of the complainant are unable or unwilling to furnish adequate protection," is not only one of the most radical innovations in that legislation but it is also one of a fundamental character. It is a clear legislative assertion of the elementary principle that charges the executive with the function to keep the peace and the public order and a severe admonition to the judges to keep hands off, as much as possible, in the performance of that duty. Historically it had the purpose to correct the widespread attitude of the federal judges to issue orders against labor activities on the mere allegations or proof of acts of violence, without admitting that the ordinary remedies for those acts lay within the criminal and tort actions. "Violence and other breaches of the peace are concededly the primary concern of the police and the machinery of the criminal law. To require, therefore, proof by complainant to the court's satisfaction that the normal resources of government 'are unable or unwilling to furnish adequate protection' emphasizes official responsibility and at the same time checks dangerous shortcuts in

the enforcement of the criminal law." Frankfurter and Green, *op. cit. supra* at 222.

A careful examination of the federal decisions and authorities proves to satiety that the federal judges have kept well in mind those legislative purposes and have issued writs of injunction against acts of violence and fraud only when it has been manifestly proved that those acts were serious and that the police was clearly unable to furnish adequate protection. I copy below a list as complete as possible of the federal precedents.[9] It contains in short synthesis the acts of fraud and violence and the action of the police.

*Cases in which the order was denied*

| Cases | Acts of fraud and violence | Action of the police |
|---|---|---|
| 1. *Grace Co.* v. *Williams,* 96 F.2d 478 (8th Cir., 1938). | Serious assaults, intimidations and threats against the employees in front of the business as well as on their way home; violent intervention with the deliveries; destruction of the merchandise. | Order is denied because complaint did not specifically allege the lack of adequate protection, although plaintiff offered to present this evidence at the trial. |
| 2. *Green* v. *Obergfell,* 121 F.2d 46 (D.C. Cir., 1941). | Different acts of assault and violence; bombing of trucks and taverns, breaking windows; puncturing tires on trucks. | "The testimony . . . fails to show either unwillingness or inability upon the part of peace officers to furnish adequate protection, or that the unlawful acts were not actually abated and the offenders punished long before the trial of the |

---

[9] I have not found a single judgment of the United States Supreme Court which discusses the specific question.

*Cases in which the order was denied*

| Cases | Acts of fraud and violence | Action of the police |
|---|---|---|
| | | present case." (P. 53–54.) Four years had elapsed between the events and the trial. |
| 3. *International Brotherhood, Etc.* v. *Internat. U., Etc.*, 106 F.2d 871 (9th Cir., 1939). | Reign of violence and intimidation (facts are not specified). | It is denied because neither the pleadings nor the findings of the trial court mentioned the lack of adequate protection. |
| 4. *Wilson & Co.* v. *Birl,* 105 F.2d 948 (3d Cir., 1939.) | Picketing (10 to 15 persons and on one occasion 97) of the business of its customers to persuade them, as they actually did, not to accept goods from the employer; very little violence in general, three or four specific acts only; the business is virtually at standstill. | The police supplied protection to the physical property; it had the situation "under supervision and control." |
| 5. *Carter* v. *Herrin Motor Freight Lines,* 131 F.2d 557 (5th Cir., 1942.) | Acts of violence against plaintiff and its property; threats and intimidation against customers. | The chief of police testified that he gave protection and kept order in front of the place of business; that he had given normal protection to the trucks of the employer; the police did not place a man on each truck as employer had requested. |

*Cases in which the order was denied*

| Cases | Acts of fraud and violence | Action of the police |
|---|---|---|
| 6. *Heintz Mfg. Co. v. Local No. 515,* 20 F. Supp. 116 E.D. Pa. 1937). | Picket line varying between 200 and 300 persons at the time when the workers arrived and left the plant; insults, opprobrious epithets and a man was pushed; numerous acts of violence and threats in the homes of employees and at other places, but there is no evidence that these acts were committed by any of the defendants or that the latter authorized or ratified them. | It maintained a force of police officers from 15 to 60 to correspond with the increase in the number of pickets; at times it made pickets aside to permit persons to enter the plant; there was no interference with the police in their duties. |
| 7. *Cupples Co. v. American Federation of Labor,* 20 F.Supp. 894 (E.D. Mo., 1937). | Mass picketing in front of the plant and in the adjacent streets, threats of violence, intimidation and insults so as to frighten employees from continuing in their work. Plant was closed and could not be reopened. | " . . . testimony shows . . . that the city of St. Louis has been most active and zealous in the performance of its duty to furnish police protection. It appears from the evidence that the police department when called upon to patrol the plaintiff's property or to furnish escorts for any of plaintiff's employees, responded promptly and |

## Cases in which the order was denied

| Cases | Acts of fraud and violence | Action of the police |
|---|---|---|
| | | efficiently." (P. 898.) |
| 8. *Knapp - Monarch Co.* v. *Anderson,* 7 F. Supp. 332 (E. D. Ill., 1934.) | Pickets of 250 or more blocking the entrance of the plant, the sidewalks and the streets throughout the day and part of the night; numerous acts of violence and intimidation preventing employees from entering, compelling plant to be kept closed; stone throwing, cars were pursued; assaults; entrance of vehicles was prevented. | From two to seven officers were sent during the mass picketing and while the acts of violence and intimidation were committed; the sheriff on certain days detailed two deputies who "did little help." The court finds that no adequate protection was given during the early days of the strike but it refused to issue an injunction, stating that the lack of adequate protection was due to the fact that the officers believed they did not have lawful authority to prevent the picket *en masse.* The court instructed them that they did have that authority. |
| 9. *Donnelly Garment Co.* v. *Dubinsky,* 154 F.2d 38 (8th Cir., 1946). | Serious acts of fraud and violence in several cities committed by mobs of women. | The order is denied because several years elapsed between the date of the events and the trial before the lower court and there was no evidence that the |

## Cases in which the order was granted

| Cases | Acts of fraud and violence | Action of the police |
|---|---|---|
| | | new officers of the city would refuse, as their predecessor had done, to give adequate protection, if necessary. |
| 1. *Toledo P. & W. R.R.* v. *Brotherhood of Trainmen,* 132 F.2d 265 (7th Cir., 1942). Reversed on other grounds in 321 U.S. 50 (1943). | Assault and injuries against employees, trains stopped and damaged, repeated acts of violence occurred along railway lines covering certain states. | Sheriffs of counties through which railway lines crossed refused to furnish minimum protection because they did not have the necessary men to do so. |
| 2. *Lake Valley Farm Products, Inc.* v. *Milk Wagon Drivers Union,* 108 F.2d 436 (7th Cir., 1939). Reversed on other grounds in 311 U.S. 91 (1940). | Pickets of all the stores which distribute employer's products; windows broken, bombs, fire, stench bombs, machinery and trucks smashed. Delivery of other products prevented; situation last several years. | "We think it is clear from the number of stores involved, and the magnitude and seriousness of the activities which had continued for several years, that the police officers were unable to control the situation." (P. 443.) |
| 3. *Cater Construction Co.* v. *Nischwitz,* 111 F.2d 971 (7th Cir., 1940). | Twelve or fifteen carloads of pickets reached the business, threatened the workers using profane language, committing a brutal assault upon one of the employees and compelled the others, through intimidation, to quit their work. Similar acts of | The sheriff refused to give protection because he did not have the facilities or financial means to protect the different construction jobs throughout the county; the chief of police of one city also refused because he had only one policeman and ad- |

*Cases in which the order was granted*

| Cases | Acts of fraud and violence | Action of the police |
|---|---|---|
| | violence and intimidation continued for several days. | vised the employer to do what the union wanted. |
| 4. *Farmer Grain Co.* v. *Toledo P. & W. R.R.,* 158 F.2d 109 (7th Cir., 1947). Reversed in 332 U.S. 748 (1947) because it became moot. | State of violence during more than one year which warrants the assertion that there was a war between the parties. The railway had failed to operate for a long time. The dispute had grown in intensity and had caused three deaths. | Despite the time elapsed the situation had not been relieved by the intervention of the police. |
| 5. *Newton* v. *Laclede Steel Co.,* 80 F.2d 636 (7th Cir., 1935). | Repeated acts of violence, shooting and bombing that it was necessary for employees to remain in the plant for several days; a crowd of 200 or 300 armed men who assaulted and injured certain employees and continued in front of the plant for one month. The strikers threatened to resume violence if the injunction were lifted. | The mayor, chief of police, sheriff and state's attorney express their inability to preserve the peace and that they would be unable to do so if violence were resumed. |
| 6. *J. B. Michael & Co., Inc.* v. *Iron Workers Local No. 782,* 173 F. Supp. 319 (W.D. Ky. 1959). | Stones are thrown, picks and iron bars are used, windshields and window glasses of automobiles | Help from the sheriff is requested but due to insufficiency of forces he is unable to furnish it and at |

*Cases in which the order was granted*

| Cases | Acts of fraud and violence | Action of the police |
|---|---|---|
| | and trucks are smashed. Nine employees injured, of which 7 had to be sent to a hospital. Two pistols were shown and work in the construction jobs had to be abandoned. | no time made any effort whatsoever to preserve the order or prevent violence. |
| 7. *Tri-plex Shoe Co.* v. *Cantor,* 25 F.Supp.996, 27 F.Supp.295 (E.D.Pa., 1939). | Acts of violence are not explained except to say that they are unjustified. | Information is very scarce; it is only said that police gave all protection which it was possible to give and despite this, violence had been used. |
| 8. *Lake Charles Stevedores, Inc.* v. *May,* 20 F.Supp 698 (W.D. La., 1935). | Pickets of from 250 to 300 men; hundreds of shots; four dead and six wounded. | The sheriff only sent two officers and the Governor declined to send state police officers or units of the National Guard. |

This survey in the federal case law [10] palpably shows the caution with which those courts have proceeded in their intent to give full effectiveness to the purposes of the Norris-La Guardia Act. The same attitude has been followed by the courts of the State of New York, where there exists an Act

---

[10] See, also, *Cinderella Theater Co.* v. *Sign Writer's Local Union,* 6 Fed. Supp. 164, 171 (E.D. Mich., 1934); *United Packing House Workers of America* v. *Wilson & Co.,* 80 Fed. Supp. 563, 570 (N.D. Ill., 1948); *General Electric Co.* v. *Gojack,* 68 Fed. Supp. 686, 687–88, 691 (N.D. Ind., 1946); *International Ass'n of Bridge Workers* v. *Pauly Jail Bldg. Co.,* 118 F.2d 615 (8th Cir. 1941), in which the question of "adequate protection" is discussed, although decided on other considerations.

very similar to the federal one.[11] *Busch Jewelry Co., Inc.* v. *United Retail Employees Union*, 22 N.E.2d 320 (1939); 5 N.Y.S. 2d 575 (1938) ; *May's Fur and Ready to Wear, Inc.* v. *Bauer*, 26 N.E.2d 279 (1940) ; *Remington Rand, Inc.* v. *Crofoot*, 289 N.Y.S. 1025 (1936) ; *Grandview Dairy, Inc.* v. *O'Leary*, 285 N.Y.S. 841, 844–45 (1936) ; *Strauss* v. *Steiner*, 18 N.Y.S. 2d 395, 402 (1940) ; *Carl Ahlers, Inc* v. *Papa*, 65 N.Y.S. 2d 687 (1946) ; *Hearn Department Stores, Inc.* v. *Livingston*, 125 N.Y.S. 2d 187 (1953) ; *Miller* v. *Gallagher*, 28 N.Y.S.2d 606, 610–612 (1941). From this last judgment we take the illuminating words of Mr. Justice Hofstadter:

"To make such a finding [that no adequate protection was furnished], the record would have to show acts of repeated violence which have gone unpunished or undealt with because of the lethargy or inability of the police to deal therewith. From the evidence here, no such inference can be drawn. On the contrary, in every reported case of violence, competent police action was immediately forthcoming; at least where the acts took place at the scene of the dispute. Nor were the acts of violence at the scene of the dispute so numerous as to create the kind of hopeless confusion which would render it difficult for the police to act. The criminal law is a standing injunction against violence and the criminal courts, as an original matter, are the proper forum in which defendants, who have breached the peace, must be charged and heard.

"To substitute a court of equity in the performance of the duties of a criminal court is a grave responsibility and one to be shunned by a court of equity, in the light of the declared statutory policy of the state. The view is not without supporting authority that even without this declared policy, wise judicial administration of justice would have advanced the cause of better employer-employee relations by displaying greater diffidence in entering the arena of the industrial dispute armed with the injunctive process.

---

[11] I must explain, however, that in New York the legality of the "objectives" test is sustained in all its force. See several of the cases cited and *Meltex, Inc.* v. *Livingston*, 145 N.Y.S.2d 858 (1955).

"While it was said by Mr. Justice Frankfurter in the Meadowmoor case that the courts 'find nothing in the Fourteenth Amendment that prevents a state if it so chooses from placing confidence in a chancellor's decree and compels it to rely exclusively on a policeman's club,' the courts of this state are constrained by the clear mandate of the statute to refer sporadic acts of violence to the protection of the police authorities to the fullest extent possible, and to utilize the chancellor's decree only if it can be shown that such protection has proved inadequate. Only when, and when only, acts of violence are so manifold and recurrent that they constitute a continuing and persistent threat to the future peace and order, with imminent injury to person or property, is the interposition of the arm of equity justified; for injunctive relief is not available as a punishment for past offense."

Which criteria or guides should be used to determine whether or not in a labor dispute the police protection is "adequate"? Undoubtedly, each situation should be decided by the specific elements composing it, but that basic principle which is effective in all the suits can not deter us from the performance of our cardinal duty of orienting the law. Especially because this is the first controversy of that kind in which we intervene and since it is a vital problem in our social and economic development, we must impose on ourselves the highest reflection and objectivity possible. Taken from a long line of federal and New York decisions which I have examined and from history and daily experience, I believe that the following standards would help considerably in clearing the situation:

1. the extent of the conflict—number of persons, distances and time;

2. the intensity of the conflict in terms of the issues that separate the parties and the emotions produced;

3. the number and seriousness of the specific acts of fraud and violence;

4. the effect of those acts on the property and the em-

ployer's business in comparison with the effects produced by the legitimate activities such as strikes and pickets;

. 5. the promptness, energy and firmness displayed by public authorities;

6. the number of policemen assigned to the conflict in proportion with the extent and intensity of the latter;

7. whether the alleged authors of the acts of fraud and violence were arrested and promptly prosecuted;

8. the effectiveness of the police intervention as shown by the total disappearance or drastic reduction of the acts of fraud and violence, and by the continuance or reassumption of the business if the aforesaid acts (as compared with legitimate activities) threatened to bring about the closing of the business or if they actually did so;

9. the existence in the community of other conflicts of the same type compelling the police force to divide its attention and its numbers;

10. the opinion of the public officers as to the capacity of the police to control the acts of fraud and violence and to offer adequate protection;

11. the time elapsed between the acts of fraud and violence and the complaint and the hearing;

12. the reasonable probability, measured by the preceding elements, that the acts of fraud and violence shall continue to be committed unless the injunction writ is issued; or in other words, the reassurance that the writ of injunction is necessary not to punish passed acts but to insure the employer the future enjoyment of his rights free of repeated and serious acts of fraud and violence.

Very few situations will be decided by the application of one or two of the preceding standards. In a great majority of the cases probably it shall be necessary to use them all. Such is the case in the present controversy. I do not have the least doubt that if applied to the facts in this case, the

only alternative would be the affirmance of the findings of the trial judge.

For the reasons stated, I am fully convinced that the police furnished petitioner the "adequate protection" mentioned in the Act and that, consequently, the trial court acted correctly in refusing to issue the writ of injunction.

Some final words. It is obvious that nothing I have said may be construed as tolerance and much less approval of violence and fraud. Acts of that nature constitute clear violations of our penal laws and of one of the basic principles of social life. When workmen employ them as a weapon of coercion they also constitute a negation of the history of the labor movement and of the principle of personal freedom tenaciously defended by them at the risk of their own life and property during long and bitter decades, and against the open and at times, brutal opposition of the employers and very often of the public authorities.

But such repugnance to fraud and violence and against whomever—employers or employees—may use them, either sporadically or systematically, as tools of coercion, can not, however, deter us from complying with the judicial rule that each case must be decided on the basis of the specific facts proved and not of the general assertions or conclusions of the witnesses, and that we must zealously comply with the clear legislative intent. I believe that under those rules we should feel constrained to affirm the judgment appealed from.